# CORRECTED EXHIBIT R

# RELATED TO MOTION TO TRANSFER, ECF NO. 1

ADRMOP,CONSOL

# U.S. District Court
# California Northern District (San Jose)
# CIVIL DOCKET FOR CASE #: 5:20−cv−03556−BLF

In re Google Digital Advertising Antitrust Litigation          Date Filed: 05/27/2020
Assigned to: Judge Beth Labson Freeman                         Jury Demand: Plaintiff
Referred to: Magistrate Judge Virginia K. DeMarchi            Nature of Suit: 410 Anti−Trust
Relate Case Cases:   5:20−cv−08984−BLF                        Jurisdiction: Federal Question
                     5:20−cv−09092−BLF
                     5:20−cv−09321−BLF
                     5:21−cv−00022−BLF
                     5:21−cv−00748−BLF
                     5:21−cv−00810−BLF
                     5:21−cv−02629−BLF
Cause: 15:2 Antitrust Litigation

**Plaintiff**

**Grand Atlas Tours**                     represented by   **Adam E. Polk**
*Individually and on behalf of all others*                  Girard Sharp LLP
*similarly situated*                                        601 California Street, Suite 1400
*TERMINATED: 10/22/2020*                                    San Francisco, CA 94108
                                                            (415) 981−4800
                                                            Fax: (415) 981−4846
                                                            Email: apolk@girardsharp.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jordan S. Elias**
                                                            Girard Sharp LLP
                                                            601 California street, Suite 1400
                                                            San Francisco, CA 94108
                                                            (415) 981−4800
                                                            Fax: (415) 981−4846
                                                            Email: jelias@girardsharp.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Scott M. Grzenczyk**
                                                            Girard Sharp LLP
                                                            601 California Street, Suite 1400
                                                            San Francisco, CA 94108
                                                            (415) 981−4800
                                                            Fax: (415) 981−4846
                                                            Email: scottg@girardsharp.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Dena C. Sharp**
                                                            Girard Sharp LLP
                                                            601 California Street, Suite 1400
                                                            San Francisco, CA 94108
                                                            (415) 981−4800
                                                            Fax: (415) 981−4846
                                                            Email: dsharp@girardsharp.com
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Surefreight Global LLC**                represented by   **Adam E. Polk**
*Individually and on behalf of all others*                  (See above for address)
*similarly situated*                                        *LEAD ATTORNEY*

*doing business as*
Prana Pets

*ATTORNEY TO BE NOTICED*

**Jordan S. Elias**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott M. Grzenczyk**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**April D Lambert**
Radice Law Firm
475 Wall Street
Unit 420
Princeton, NJ 08540
United Sta
312-339-7140
Email: alambert@radicelawfirm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Archana Tamoshunas**
Taus, Cebulash & Landau, LLP
80 Maiden Lane
Suite 1204
New York, NY 10038
212-931-0704
Email: atamoshunas@tcllaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Daniel Radice**
Radice Law Firm, PC
475 Wall Street
Princeton, NJ 08540
646-245-8502
Fax: 609-385-0745
Email: jradice@radicelawfirm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dena C. Sharp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hanson Law Firm, PC**
*Individually and on behalf of all others
similarly situated*

represented by **Adam E. Polk**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jordan S. Elias**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott M. Grzenczyk**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**April D Lambert**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Archana Tamoshunas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Daniel Radice**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dena C. Sharp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Devaney**                    represented by **Tina Wolfson**
                                       Ahdoot & Wolfson, PC
                                       2600 West Olive Avenue, Suite 500
                                       Burbank, CA 91505
                                       (310) 474-9111
                                       Fax: (310) 474-8585
                                       Email: twolfson@ahdootwolfson.com
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Andrew William Ferich**
                                       Ahdoot & Wolfson PC
                                       201 King of Prussia Rd.
                                       Suite 650
                                       Radnor, PA 19087
                                       United Sta
                                       (310) 474-9111
                                       Fax: (310) 474-8585
                                       Email: aferich@ahdootwolfson.com
                                       *PRO HAC VICE*
                                       *ATTORNEY TO BE NOTICED*

                                       **Christopher Eric Stiner**
                                       Ahdoot & Wolfson, PC
                                       2600 West Olive Avenue, Suite 500
                                       Burbank, CA 91505
                                       (310) 474-9111
                                       Fax: (310) 474-8585
                                       Email: cstiner@ahdootwolfson.com
                                       *ATTORNEY TO BE NOTICED*

                                       **Dena C. Sharp**
                                       (See above for address)
                                       *ATTORNEY TO BE NOTICED*

                                       **Rachel Renee Johnson**
                                       Ahdoot & Wolfson, PC
                                       2600 West Olive Avenue, Suite 500
                                       Burbank, CA 91505
                                       (310) 474-9111
                                       Fax: (310) 474-8585
                                       Email: rjohnson@ahdootwolfson.com
                                       *ATTORNEY TO BE NOTICED*

                                       **Theodore Walter Maya**

Ahdoot & Wolfson, PC
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
(310) 474-9111
Fax: (310) 474-8585
Email: tmaya@ahdootwolfson.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nicholas Arrieta**                    represented by **Tina Wolfson**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Christopher Eric Stiner**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Dena C. Sharp**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Rachel Renee Johnson**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Theodore Walter Maya**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sara Yberra**                         represented by **Tina Wolfson**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Andrew William Ferich**
                                        (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **Christopher Eric Stiner**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Dena C. Sharp**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Rachel Renee Johnson**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Theodore Walter Maya**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Stellman**                    represented by **Andrew William Ferich**
                                        (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

**Rachel Renee Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dena C. Sharp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Vitor Lindo**                          represented by **Andrew William Ferich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jordan S. Elias**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Renee Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Wolfson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dena C. Sharp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sweepstakes Today, LLC**               represented by **David W. Mitchell**
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231−1058
Fax: (619) 231−7423
Email: davidm@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mikula Web Solutions, Inc.**           represented by **Dennis Stewart**
Gustafson Gluek PLLC
600 B Street, 17th Floor
San Diego, CA 92101
(619) 595−3299
Email: dstewart@gustafsongluek.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mark J. Astarita**                     represented by **April D Lambert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Archana Tamoshunas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dena C. Sharp**

(See above for address)
*ATTORNEY TO BE NOTICED*

**John Daniel Radice**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Organic Panaceas, LLC**

represented by **Philip Lawrence Gregory**
Gregory Law Group
1250 Godetia Drive
Woodside, CA 94062
650−278−2957
Email: pgregory@gregorylawgroup.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Derriel Carlton McCorvey**
McCorvey Law, LLC
102 Versailles Blvd.
Ste. 620
Lafayette, LA 70501
337−291−2431
Fax: 337−291−2433
Email: derriel@mccorveylaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Google LLC**

represented by **John Edward Schmidtlein**
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005−5901
(202) 434−5901
Fax: 434−5029
Email: jschmidtlein@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Jacobson**
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the America
40th Floor
New York, NY 10019
212−497−7758
Fax: 212−999−5899
Email: jjacobson@wsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justina Kahn Sessions**
Wilson Sonsini Goodrich & Rosati, P.C.
One Market Plaza, Spear Tower, Suite
3300
San Francisco, CA 94105
415−947−2000
Fax: 415−947−2099
Email: jsessions@wsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin M Greenblum**
Williams and Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
202−434−5000
Email: bgreenblum@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David H. Kramer**
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304−1050
(650) 493−9300
Fax: (650) 565−5100
Email: dkramer@wsgr.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Alphabet Inc.**
*a Delaware Corporation*

represented by **John Edward Schmidtlein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Jacobson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justina Kahn Sessions**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin M Greenblum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David H. Kramer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Genius Media Group, Inc.**

represented by **Hsiao C. Mao**
Boies Schiller Flexner LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
(415) 293−6800
Fax: (415) 293−6899
Email: mmao@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Philip C. Korologos**
Boies Schiller Flexner LLP
575 Lexington Avenue
New York, NY 10022
212−446−2300
Email: pkorologos@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**The Nation Company, L.P.**

represented by

**Hsiao C. Mao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip C. Korologos**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Interested Party**

**The Progressive, Inc.**                    represented by **Hsiao C. Mao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip C. Korologos**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Sterling International Consulting**         represented by **Sophia Marie Rios**
**Group**                                     Berger Montague PC
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
(619) 489-0300
Email: srios@bm.net
*ATTORNEY TO BE NOTICED*

**Interested Party**

**JLASALLE ENTERPRISES LLC**                 represented by **Robert J. Gralewski , Jr.**
Kirby McInerney LLP
600 B Street, Suite 2110
San Diego, CA 92101
619-784-1442
Email: bgralewski@kmllp.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Kimberly Negron**                          represented by **Pamela Ann Markert**
Cera LLP
595 Market Street Suite 1350
San Francisco, CA 94105
415-977-2228
Email: pmarkert@cerallp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/27/2020 | 1 | CLASS ACTION COMPLAINT (with jury demand) against Alphabet Inc., Google LLC (Filing fee $ 400, receipt number 0971-14511885.). Filed by Grand Atlas Tours, Hanson Law Firm, PC, Surefreight Global LLC. (Attachments: # 1 Civil Cover Sheet)(Sharp, Christina) (Filed on 5/27/2020) Modified on 5/28/2020 (cjlS, COURT STAFF). (Entered: 05/27/2020) |
| 05/27/2020 | 2 | Proposed Summons. (Sharp, Christina) (Filed on 5/27/2020) (Entered: 05/27/2020) |
| 05/27/2020 | 3 | Case assigned to Magistrate Judge Donna M. Ryu.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. |

| | | Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5−1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 6/10/2020. (haS, COURT STAFF) (Filed on 5/27/2020) (Entered: 05/27/2020) |
|---|---|---|
| 05/28/2020 | 4 | Summons Issued as to Alphabet Inc., Google LLC. (cjlS, COURT STAFF) (Filed on 5/28/2020) (Entered: 05/28/2020) |
| 05/28/2020 | 5 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 8/26/2020. Initial Case Management Conference set for 9/2/2020 01:30 PM in Oakland, Courtroom 4, 3rd Floor. (cjlS, COURT STAFF) (Filed on 5/28/2020) (Entered: 05/28/2020)** |
| 05/29/2020 | 6 | Certificate of Interested Entities by Grand Atlas Tours identifying Other Affiliate Grand Atlas Tours, Other Affiliate Eric Lewis, Other Affiliate Flannery Wasson for Grand Atlas Tours. (Sharp, Christina) (Filed on 5/29/2020) (Entered: 05/29/2020) |
| 05/29/2020 | 7 | Corporate Disclosure Statement by Grand Atlas Tours (Sharp, Christina) (Filed on 5/29/2020) (Entered: 05/29/2020) |
| 05/29/2020 | 8 | Certificate of Interested Entities by Hanson Law Firm, PC (Sharp, Christina) (Filed on 5/29/2020) (Entered: 05/29/2020) |
| 05/29/2020 | 9 | Corporate Disclosure Statement by Hanson Law Firm, PC (Sharp, Christina) (Filed on 5/29/2020) (Entered: 05/29/2020) |
| 05/29/2020 | 10 | Certificate of Interested Entities by Surefreight Global LLC identifying Other Affiliate Solomon Noonan, Other Affiliate Bradley Noonan for Surefreight Global LLC. (Sharp, Christina) (Filed on 5/29/2020) (Entered: 05/29/2020) |
| 05/29/2020 | 11 | Corporate Disclosure Statement by Surefreight Global LLC (Sharp, Christina) (Filed on 5/29/2020) (Entered: 05/29/2020) |
| 06/10/2020 | 12 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Grand Atlas Tours, Hanson Law Firm, PC, Surefreight Global LLC.. (Sharp, Christina) (Filed on 6/10/2020) (Entered: 06/10/2020) |
| 06/10/2020 | 13 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE−NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (ig, COURT STAFF) (Filed on 6/10/2020) (Entered: 06/10/2020) |
| 06/11/2020 | 14 | ***CLERK ERROR, INCORRECT PDF ATTACHED, SEE DKT. 15 *** ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Beth Labson Freeman for all further proceedings. Magistrate Judge Donna M. Ryu no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by the Clerk on 6/11/2020. (Attachments: # 1 Notice of Eligibility for Video Recording)(ajsS, COURT STAFF) (Filed on 6/11/2020) Modified on 6/11/2020 (ajsS, COURT STAFF). (Entered: 06/11/2020) |
| 06/11/2020 | 15 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Beth Labson Freeman for all further proceedings. Magistrate Judge Donna M. Ryu no longer assigned to case, Notice: The assigned judge participates in the Cameras in the** |

| | | Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by the Clerk on 6/11/2020. (Attachments: # 1 Notice of Eligibility for Video Recording)(ajsS, COURT STAFF) (Filed on 6/11/2020) (Entered: 06/11/2020) |
|---|---|---|
| 06/11/2020 | 16 | SUMMONS Returned Executed by Grand Atlas Tours, Hanson Law Firm, PC, Surefreight Global LLC. Google LLC served on 6/3/2020, answer due 6/24/2020. (Sharp, Christina) (Filed on 6/11/2020) (Entered: 06/11/2020) |
| 06/11/2020 | 17 | SUMMONS Returned Executed by Grand Atlas Tours, Hanson Law Firm, PC, Surefreight Global LLC. Alphabet Inc. served on 6/3/2020, answer due 6/24/2020. (Sharp, Christina) (Filed on 6/11/2020) (Entered: 06/11/2020) |
| 06/12/2020 | 18 | CLERK'S NOTICE RESETTING CASE MANAGEMENT CONFERENCE AFTER REASSIGNMENT. Case Management Statement due by 9/17/2020. Initial Case Management Conference set for 9/24/2020 11:00 AM in San Jose, Courtroom 3, 5th Floor. *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (tshS, COURT STAFF) (Filed on 6/12/2020) (Entered: 06/12/2020) |
| 06/23/2020 | 19 | STIPULATION *Regarding Defendants' Deadline To Respond to the Complaint* filed by Alphabet Inc., Google LLC. (Schmidtlein, John) (Filed on 6/23/2020) (Entered: 06/23/2020) |
| 06/23/2020 | 20 | NOTICE of Appearance by John Edward Schmidtlein (Schmidtlein, John) (Filed on 6/23/2020) (Entered: 06/23/2020) |
| 06/23/2020 | 21 | Certificate of Interested Entities by Alphabet Inc., Google LLC identifying Corporate Parent XXVI Holdings Inc. for Google LLC. (Schmidtlein, John) (Filed on 6/23/2020) (Entered: 06/23/2020) |
| 06/24/2020 | 22 | **ORDER APPROVING STIPULATION 19 REGARDING DEFENDANTS' DEADLINE TO RESPOND TO THE COMPLAINT. Signed by Judge Beth Labson Freeman on 6/24/2020. (blflc3S, COURT STAFF) (Filed on 6/24/2020) (Entered: 06/24/2020)** |
| 07/20/2020 | 23 | ADMINISTRATIVE MOTION To Consider Whether Cases Should Be Related filed by Alphabet Inc., Google LLC. Responses due by 7/24/2020. (Schmidtlein, John) (Filed on 7/20/2020) (Entered: 07/20/2020) |
| 07/21/2020 | 24 | **ORDER RELATING CASES (granting 23 ). Signed by Judge Beth Labson Freeman on 7/21/2020. (blflc3S, COURT STAFF) (Filed on 7/21/2020) (Entered: 07/21/2020)** |
| 08/11/2020 | 25 | STIPULATION WITH PROPOSED ORDER *for Consolidation and Setting Deadlines* filed by Grand Atlas Tours, Hanson Law Firm, PC, Surefreight Global LLC. (Sharp, Christina) (Filed on 8/11/2020) (Entered: 08/11/2020) |
| 08/11/2020 | 26 | **JOINT STIPULATION 25 AND ORDER FOR CONSOLIDATION ANDSETTING DEADLINES. Signed by Judge Beth Labson Freeman on 8/11/2020. Associated Cases: 5:20−cv−03556−BLF, 5:20−cv−04130−BLF(blflc3S, COURT STAFF) (Filed on 8/11/2020) (Entered: 08/11/2020)** |
| 09/17/2020 | 27 | NOTICE of Appearance by David H. Kramer *for Defendants Google LLC and Alphabet Inc.* (Kramer, David) (Filed on 9/17/2020) (Entered: 09/17/2020) |
| 09/17/2020 | 28 | MOTION for leave to appear in Pro Hac Vice *of Benjamin M. Greenblum for Defendants Google LLC and Alphabet Inc.* ( Filing fee $ 310, receipt number 0971−14954962.) filed by Alphabet Inc., Google LLC. (Greenblum, Benjamin) (Filed on 9/17/2020) (Entered: 09/17/2020) |
| 09/17/2020 | 29 | JOINT CASE MANAGEMENT STATEMENT filed by Nicholas Arrieta, Michael Devaney, Grand Atlas Tours, Hanson Law Firm, PC, Surefreight Global LLC, Sara Yberra. (Sharp, Christina) (Filed on 9/17/2020) (Entered: 09/17/2020) |
| 09/18/2020 | 30 | **CLERK'S NOTICE CONVERTING CASE MANAGEMENT CONFERENCE ON 9/24/2020 TO ZOOM WEBINAR. Case Management Conference set for 9/24/2020 at 11:00 AM before Judge Beth** |

|  |  | Labson Freeman will be held via a Zoom webinar. |
|--|--|--|
|  |  | **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/blf |
|  |  | **Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than September 16, 2020 at 2:00 PM PST. |
|  |  | **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. |
|  |  | **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. |
|  |  | **(tshS, COURT STAFF) (Entered: 09/18/2020)** |
| 09/21/2020 | 31 | **ORDER GRANTING 28 APPLICATION FOR ADMISSION OF ATTORNEY PRO HAC VICE. Signed by Judge Beth Labson Freeman on 9/21/2020. (blflc4S, COURT STAFF) (Filed on 9/21/2020) (Entered: 09/21/2020)** |
| 09/24/2020 | 32 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Initial Case Management Conference held on 9/24/2020.**<br>**No Trial Dates set at this time.**<br>**FTR Time: 11:19 − 11:48.**<br>**Plaintiff Attorney: Dena Sharp, Jordan Elias, Tina Wolfson via Zoom Webinar.**<br>**Defendant Attorney: Benjamin Greenblum via Zoom Webinar.**<br>*(This is a text−only entry generated by the court. There is no document associated with this entry.)* **(tshS, COURT STAFF) (Date Filed: 9/24/2020) (Entered: 09/25/2020)** |
| 09/25/2020 | 33 | TRANSCRIPT ORDER for proceedings held on 9/24/2020 before Judge Beth Labson Freeman by Nicholas Arrieta, Michael Devaney, Grand Atlas Tours, Hanson Law Firm, PC, Surefreight Global LLC, Sara Yberra, for Court Reporter FTR − San Jose. (Sharp, Christina) (Filed on 9/25/2020) **(Transcriber: Belle Ball)** Modified on 9/25/2020 (lmh, COURT STAFF). (Entered: 09/25/2020) |
| 09/25/2020 | 34 | TRANSCRIPT ORDER for proceedings held on 9/24/2020 before Judge Beth Labson Freeman by Alphabet Inc., Google LLC, for Court Reporter FTR − San Jose. (Greenblum, Benjamin) (Filed on 9/25/2020) (Entered: 09/25/2020) |
| 09/25/2020 | 35 | AMENDED COMPLAINT *Consolidated Class Action Complaint* against Alphabet Inc., Google LLC. Filed byHanson Law Firm, PC, Surefreight Global LLC, Grand Atlas Tours, Michael Devaney, Michael Stellman, Vitor Lindo. (Sharp, Christina) (Filed on 9/25/2020) (Entered: 09/25/2020) |
| 10/02/2020 | 36 | Transcript of Proceedings held on September 24, 2020, before Judge Beth Labson Freeman. Transcriber Belle Ball, CSR, telephone number (415)373−2529, belle_ball@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 33 Transcript Order, 34 Transcript Order ) Release of Transcript Restriction set for 12/31/2020. (Related documents(s) 33 , 34 ) (ballbb15S, COURT STAFF) (Filed on 10/2/2020) (Entered: 10/02/2020) |
| 10/16/2020 | 37 | Statement *regarding Early Discovery* by Michael Devaney, Grand Atlas Tours, Hanson Law Firm, PC, Vitor Lindo, Michael Stellman, Surefreight Global LLC. (Sharp, Christina) (Filed on 10/16/2020) (Entered: 10/16/2020) |
| 10/20/2020 | 38 | **ORDER DECLINING TO RULE ON EARLY DISCOVERY DISPUTE. Signed by Judge Beth Labson Freeman on 10/20/2020. (blflc4S, COURT STAFF) (Filed on 10/20/2020) (Entered: 10/20/2020)** |

| 10/22/2020 | 39 | NOTICE of Voluntary Dismissal by Grand Atlas Tours (Sharp, Christina) (Filed on 10/22/2020) (Entered: 10/22/2020) |
|---|---|---|
| 10/22/2020 | 40 | **ORDER APPROVING NOTICE OF VOLUNTARY DISMISSAL OF PLAINTIFF GRAND ATLAS LLC D/B/A GRAND ATLAS TOURS. Singed by Judge Beth Labson Freeman ON 10/22/2020. (blflc4S, COURT STAFF) (Filed on 10/22/2020) (Entered: 10/22/2020)** |
| 11/09/2020 | 41 | MOTION to Dismiss *Consolidated Class Action Complaint* filed by Alphabet Inc., Google LLC. Motion Hearing set for 4/8/2021 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 12/24/2020. Replies due by 1/25/2021. (Attachments: # 1 Proposed Order, # 2 Declaration of Michael Kreins, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D)(Schmidtlein, John) (Filed on 11/9/2020) (Entered: 11/09/2020) |
| 11/09/2020 | 42 | MOTION to Stay *Discovery* filed by Alphabet Inc., Google LLC. Motion Hearing set for 4/8/2021 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 11/23/2020. Replies due by 11/30/2020. (Attachments: # 1 Proposed Order)(Schmidtlein, John) (Filed on 11/9/2020) (Entered: 11/09/2020) |
| 11/23/2020 | 43 | OPPOSITION/RESPONSE (re 42 MOTION to Stay *Discovery* ) filed byMichael Devaney, Hanson Law Firm, PC, Vitor Lindo, Michael Stellman, Surefreight Global LLC. (Attachments: # 1 Declaration of Dena C. Sharp, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Sharp, Christina) (Filed on 11/23/2020) (Entered: 11/23/2020) |
| 11/25/2020 | 44 | STIPULATION WITH PROPOSED ORDER *Regarding Defendants' Deadline To File Their Reply in Support of Their Motion To Stay Discovery* filed by Alphabet Inc., Google LLC. (Attachments: # 1 Declaration)(Greenblum, Benjamin) (Filed on 11/25/2020) (Entered: 11/25/2020) |
| 11/27/2020 | 45 | STIPULATION WITH PROPOSED ORDER *Regarding Plaintiffs' Deadline To Amend Their Complaint* filed by Alphabet Inc., Google LLC. (Attachments: # 1 Declaration)(Greenblum, Benjamin) (Filed on 11/27/2020) (Entered: 11/27/2020) |
| 11/30/2020 | 46 | **ORDER GRANTING 44 STIPULATION REGARDING BRIEFING SCHEDULE OF MOTION FOR STAY OF DISCOVERY. Signed by Judge Beth Labson Freeman on 11/30/2020. (blflc4, COURT STAFF) (Filed on 11/30/2020) (Entered: 11/30/2020)** |
| 11/30/2020 | 47 | **ORDER GRANTING 45 STIPULATION REGARDING PLAINTIFFS DEADLINE TO AMEND THEIR COMPLAINT. Signed by Judge Beth Labson Freeman on 11/30/2020.(blflc4, COURT STAFF) (Filed on 11/30/2020) Modified on 11/30/2020 (sfbS, COURT STAFF). (Entered: 11/30/2020)** |
| 12/02/2020 | 48 | NOTICE of Change of Address by Theodore Walter Maya (Maya, Theodore) (Filed on 12/2/2020) (Entered: 12/02/2020) |
| 12/02/2020 | 49 | NOTICE of Change of Address by Christopher Eric Stiner (Stiner, Christopher) (Filed on 12/2/2020) (Entered: 12/02/2020) |
| 12/02/2020 | 50 | NOTICE of Change of Address by Tina Wolfson (Wolfson, Tina) (Filed on 12/2/2020) (Entered: 12/02/2020) |
| 12/04/2020 | 51 | REPLY (re 42 MOTION to Stay *Discovery* ) filed byAlphabet Inc., Google LLC. (Schmidtlein, John) (Filed on 12/4/2020) (Entered: 12/04/2020) |
| 12/04/2020 | 52 | AMENDED COMPLAINT *First* against Alphabet Inc., Google LLC. Filed byVitor Lindo, Hanson Law Firm, PC, Surefreight Global LLC. (Sharp, Christina) (Filed on 12/4/2020) (Entered: 12/04/2020) |
| 12/08/2020 | 53 | **ORDER GRANTING 42 MOTION TO STAY DISCOVERY. Signed by Judge Beth Labson Freeman on 12/8/2020.(blflc4S, COURT STAFF) (Filed on 12/8/2020) (Entered: 12/08/2020)** |
| 12/21/2020 | 54 | NOTICE by Hanson Law Firm, PC, Vitor Lindo, Surefreight Global LLC *of Pendency of Other Action or Proceeding* (Attachments: # 1 Exhibit A)(Sharp, Christina) (Filed on 12/21/2020) (Entered: 12/21/2020) |

| 12/22/2020 | 55 | MOTION to Relate Case re 20−cv− 08984−LB filed by Alphabet Inc., Google LLC. (Attachments: # 1 Declaration Benjamin M. Greenblum, # 2 Exhibit A, # 3 Exhibit B)(Schmidtlein, John) (Filed on 12/22/2020) Modified on 12/23/2020 (sfbS, COURT STAFF). (Entered: 12/22/2020) |
| --- | --- | --- |
| 12/22/2020 | 56 | Proposed Order re 55 MOTION to Relate Case by Alphabet Inc., Google LLC. (Schmidtlein, John) (Filed on 12/22/2020) (Entered: 12/22/2020) |
| 12/22/2020 | 57 | MOTION to Relate Case re 20−cv−09092−DMR filed by Alphabet Inc., Google LLC. (Attachments: # 1 Declaration Benjamin M. Greenblum, # 2 Exhibit A, # 3 Proposed Order)(Schmidtlein, John) (Filed on 12/22/2020) Modified on 12/23/2020 (sfbS, COURT STAFF). (Entered: 12/22/2020) |
| 12/28/2020 | 58 | OPPOSITION/RESPONSE (re 55 MOTION to Relate Case , 57 MOTION to Relate Case ) filed byHanson Law Firm, PC, Vitor Lindo, Surefreight Global LLC. (Sharp, Christina) (Filed on 12/28/2020) (Entered: 12/28/2020) |
| 12/28/2020 | 59 | OPPOSITION/RESPONSE (re 55 MOTION to Relate Case ) filed bySweepstakes Today, LLC. (Attachments: # 1 Declaration Declaration of Steven M. Jodlowski, # 2 Exhibit 1 − Defendants' Memorandum in Support of Its Motion to Dismiss the Complaint, Inform Inc. v. Google LLC, et al., No. 1:19−cv−05362−JPB (N.D. Ga. Jan. 22, 2020), ECF No. 16−1, # 3 Exhibit 2 − Defendants' Response in Opposition to Plaintiff J. Jackson Paige's Motion for Transfer and Consolidation Pursuant to 28 U.S.C. 1407, In re Google Inc., Antitrust Litig., MDL No. 2981 (Nov. 27, 2020), ECF No. 36, # 4 Exhibit 3 − Defendants' Response in Opposition to Amos Kober's Administrative Motion to Relate Cases, In re Google Play Consumer Antitrust Litig., No. 20−cv−05761−JD (N.D. Cal. Dec. 14, 2020), ECF No. 127, # 5 Proposed Order)(Mitchell, David) (Filed on 12/28/2020) (Entered: 12/28/2020) |
| 12/28/2020 | 60 | OPPOSITION/RESPONSE (re 57 MOTION to Relate Case ) filed byGenius Media Group, Inc., The Nation Company, L.P., The Progressive, Inc.. (Attachments: # 1 Proposed Order)(Korologos, Philip) (Filed on 12/28/2020) (Entered: 12/28/2020) |
| 01/04/2021 | 61 | MOTION to Relate Case filed by Alphabet Inc., Google LLC. (Attachments: # 1 Declaration Benjamin M. Greenblum, # 2 Exhibit A, # 3 Proposed Order)(Schmidtlein, John) (Filed on 1/4/2021) (Entered: 01/04/2021) |
| 01/04/2021 | 62 | RESPONSE re 54 Notice (Other) *Defendants' Response to Plaintiffs' Notice of Pendency of Other Action or Proceeding* by Alphabet Inc., Google LLC. (Schmidtlein, John) (Filed on 1/4/2021) (Entered: 01/04/2021) |
| 01/08/2021 | 63 | OPPOSITION/RESPONSE (re 61 MOTION to Relate Case ) filed bySterling International Consulting Group. (Attachments: # 1 Proposed Order)(Rios, Sophia) (Filed on 1/8/2021) (Entered: 01/08/2021) |
| 01/08/2021 | 64 | MOTION to Relate Case *UNOPPOSED ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED* filed by Alphabet Inc., Google LLC. (Attachments: # 1 Proposed Order)(Schmidtlein, John) (Filed on 1/8/2021) (Entered: 01/08/2021) |
| 01/08/2021 | 65 | OPPOSITION/RESPONSE (re 61 MOTION to Relate Case ) filed byHanson Law Firm, PC, Vitor Lindo, Surefreight Global LLC. (Sharp, Christina) (Filed on 1/8/2021) (Entered: 01/08/2021) |
| 01/15/2021 | 66 | MOTION to Dismiss *First Amended Consolidated Class Action Complaint* filed by Alphabet Inc., Google LLC. Motion Hearing set for 4/8/2021 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 2/15/2021. Replies due by 3/17/2021. (Attachments: # 1 Proposed Order, # 2 Declaration of Michael Kreins, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E)(Schmidtlein, John) (Filed on 1/15/2021) (Entered: 01/15/2021) |
| 01/20/2021 | 67 | RESPONSE re 54 Notice (Other), 62 Response ( Non Motion ) *Defendants' Supplemental Response to Plaintiffs' Notice of Pendency of Other Action* by Alphabet Inc., Google LLC. (Attachments: # 1 Exhibit 1)(Schmidtlein, John) (Filed on 1/20/2021) (Entered: 01/20/2021) |
| 01/21/2021 | 68 | **ORDER ON MOTIONS TO RELATE AT ECF 55 , 57 , 61 , 64 . Signed by Judge Beth Labson Freeman on 1/21/2021. (blflc4S, COURT STAFF) (Filed on** |

|  |  | 1/21/2021) (Entered: 01/21/2021) |
|---|---|---|
| 01/22/2021 | 69 | **ORDER ON MOTIONS TO RELATE. Signed by Judge Beth Labson Freeman on 1/22/2021. (blflc4S, COURT STAFF) (Filed on 1/22/2021) (Entered: 01/22/2021)** |
| 01/22/2021 | 70 | **ORDER SETTING CASE MANAGEMENT CONFERENCE FOR FEBRUARY 4, 2021 AT 10AM. Signed by Judge Beth Labson Freeman on 1/22/2021. (blflc4S, COURT STAFF) (Filed on 1/22/2021) (Entered: 01/22/2021)** |
| 01/22/2021 |  | Set Case Management Conference re 70 ORDER SETTING CASE MANAGEMENT CONFERENCE. Case Management Conference set for 2/4/2021 10:00 AM in San Jose, – To be determined. (tshS, COURT STAFF) (Filed on 1/22/2021) (Entered: 01/22/2021) |
| 01/28/2021 | 71 | Statement *Regarding Consolidation* by Alphabet Inc., Google LLC. (Schmidtlein, John) (Filed on 1/28/2021) (Entered: 01/28/2021) |
| 01/28/2021 | 72 | JOINT CASE MANAGEMENT STATEMENT *JOINT PUBLISHER PLAINTIFFS CASE MANAGEMENT CONFERENCE STATEMENT* filed by Genius Media Group, Inc., The Nation Company, L.P., The Progressive, Inc.. (Mao, Hsiao) (Filed on 1/28/2021) (Entered: 01/28/2021) |
| 01/28/2021 | 73 | CASE MANAGEMENT STATEMENT filed by Hanson Law Firm, PC, Vitor Lindo, Surefreight Global LLC. (Sharp, Christina) (Filed on 1/28/2021) (Entered: 01/28/2021) |
| 02/01/2021 | 74 | CLERKS NOTICE CONVERTING CASE MANAGEMENT CONFERENCE TO ZOOM WEBINAR. Case Management Conference set for 2/4/2021 10:00 AM before Judge Beth Labson Freeman will be held via a Zoom webinar.

**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/blf

**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than February 3, 2021 at 2:00 PM PST.

**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.

**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.

*(This is a text–only entry generated by the court. There is no docu ment associated with this entry.)* (tshS, COURT STAFF) (Filed on 2/1/2021) (Entered: 02/01/2021) |
| 02/03/2021 | 75 | NOTICE of Appearance by Jonathan M. Jacobson *for Defendants Google LLC and Alphabet Inc.* (Jacobson, Jonathan) (Filed on 2/3/2021) (Entered: 02/03/2021) |
| 02/03/2021 | 76 | MOTION to Relate Case *Interested Party's Unopposed Administrative Motion to Consider Whether Cases Should Be Related* filed by JLASALLE ENTERPRISES LLC. (Attachments: # 1 Declaration of Robert J. Gralewski Jr., # 2 Exhibit A – JLaSalle Complaint, # 3 Proposed Order Granting Motion to Relate)(Gralewski, Robert) (Filed on 2/3/2021) (Entered: 02/03/2021) |
| 02/03/2021 | 77 | NOTICE of Appearance by Justina Kahn Sessions *for Defendants Google LLC and Alphabet Inc.* (Sessions, Justina) (Filed on 2/3/2021) (Entered: 02/03/2021) |
| 02/03/2021 | 78 | **ORDER INVITING PLAINTIFF IN 21–CV–748 TO FEBRUARY 4, 2021 CASE MANAGEMENT CONFERENCE. Signed by Judge Beth Labson Freeman on 2/3/2021. (blflc4S, COURT STAFF) (Filed on 2/3/2021) (Entered: 02/03/2021)** |
| 02/04/2021 | 79 | MOTION to Relate Case *Administrative Motion to Consider Whether Cases Should be Related* filed by Mikula Web Solutions, Inc.. (Attachments: # 1 Declaration of Dennis |

| | | |
|---|---|---|
| | | Stewart, # 2 Exhibit Mikula Complaint, # 3 Proposed Order)(Stewart, Dennis) (Filed on 2/4/2021) (Entered: 02/04/2021) |
| 02/04/2021 | 80 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Case Management Conference held on 2/4/2021.** **Total Time in Court: 52 Minutes.** **Court Reporter: Summer Fisher.** **Plaintiff Attorney: Christina C. Sharp, Adam E. Polk, Tina Wolfson, David W. Mitchell, Sophia Marie Rios, Robert J. Gralewski, Jr., Philip C. Korologos via Zoom Webinar.** **Defendant Attorney: John Edward Schmidtlein via Zoom Webinar.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(tshS, COURT STAFF) (Date Filed: 2/4/2021) (Entered: 02/05/2021)** |
| 02/08/2021 | 81 | TRANSCRIPT ORDER for proceedings held on 2/4/2021 before Judge Beth Labson Freeman by Hanson Law Firm, PC, Vitor Lindo, Surefreight Global LLC, for Court Reporter Summer Fisher. (Sharp, Christina) (Filed on 2/8/2021) (Entered: 02/08/2021) |
| 02/08/2021 | 82 | TRANSCRIPT ORDER for proceedings held on 02/04/2021 before Judge Beth Labson Freeman by Sterling International Consulting Group, for Court Reporter Summer Fisher. (Rios, Sophia) (Filed on 2/8/2021) (Entered: 02/08/2021) |
| 02/08/2021 | 83 | TRANSCRIPT ORDER for proceedings held on February 4, 2021 before Judge Beth Labson Freeman by Alphabet Inc., Google LLC, for Court Reporter Summer Fisher. (Schmidtlein, John) (Filed on 2/8/2021) (Entered: 02/08/2021) |
| 02/08/2021 | 84 | Transcript of Proceedings held on 02/04/2021, before Judge Beth Labson Freeman. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re (41 in 5:20-cv-08984-BLF) Transcript Order ) Redaction Request due 3/1/2021. Redacted Transcript Deadline set for 3/11/2021. Release of Transcript Restriction set for 5/10/2021. (Fisher, Summer) (Filed on 2/8/2021) (Entered: 02/08/2021) |
| 02/08/2021 | 85 | TRANSCRIPT ORDER for proceedings held on 02/04/2021 before Judge Beth Labson Freeman by Nicholas Arrieta, Michael Devaney, Sara Yberra, for Court Reporter Summer Fisher. (Wolfson, Tina) (Filed on 2/8/2021) (Entered: 02/08/2021) |
| 02/08/2021 | 86 | OPPOSITION/RESPONSE (re 76 MOTION to Relate Case *Interested Party's Unopposed Administrative Motion to Consider Whether Cases Should Be Related* ) filed byAlphabet Inc., Google LLC. (Sessions, Justina) (Filed on 2/8/2021) (Entered: 02/08/2021) |
| 02/08/2021 | 87 | OPPOSITION/RESPONSE (re 79 MOTION to Relate Case *Administrative Motion to Consider Whether Cases Should be Related* ) filed byAlphabet Inc., Google LLC. (Sessions, Justina) (Filed on 2/8/2021) (Entered: 02/08/2021) |
| 02/09/2021 | 88 | ADMINISTRATIVE MOTION Relate Case *Negron v. Google LLC* filed by Kimberly Negron. Responses due by 2/16/2021. (Attachments: # 1 Declaration Declaration of Isquith and Exhibit, # 2 Proposed Order)(Markert, Pamela) (Filed on 2/9/2021) (Entered: 02/09/2021) |
| 02/09/2021 | 89 | **CASE MANAGEMENT ORDER NO. 1. Signed by Judge Beth Labson Freeman on 2/9/2021. (blflc4S, COURT STAFF) (Filed on 2/9/2021) (Entered: 02/09/2021)** |
| 02/09/2021 | 90 | **ORDER GRANTING MOTIONS 76 79 TO RELATE CASES. Signed by Judge Beth Labson Freeman on 2/9/2021. (blflc4S, COURT STAFF) (Filed on 2/9/2021) (Entered: 02/09/2021)** |
| 02/10/2021 | 91 | CLERK'S NOTICE SETTING CASE MANAGEMENT CONFERENCE. Case Management Conference set for 4/8/2021 11:00 AM in San Jose, Courtroom 3, 5th Floor. *(This is a text-only entry generated by the court. There is no document associated* |

| | | |
|---|---|---|
| | | *with this entry.)*<br>(tshS, COURT STAFF) (Filed on 2/10/2021) (Entered: 02/10/2021) |
| 02/11/2021 | 92 | TRANSCRIPT ORDER for proceedings held on 02/04/21 before Judge Beth Labson Freeman by Mikula Web Solutions, Inc., for Court Reporter Summer Fisher. (Stewart, Dennis) (Filed on 2/11/2021) (Entered: 02/11/2021) |
| 02/15/2021 | 93 | OPPOSITION/RESPONSE (re 66 MOTION to Dismiss *First Amended Consolidated Class Action Complaint* ) filed byHanson Law Firm, PC, Vitor Lindo, Surefreight Global LLC. (Elias, Jordan) (Filed on 2/15/2021) (Entered: 02/15/2021) |
| 02/16/2021 | 94 | OPPOSITION/RESPONSE (re 88 ADMINISTRATIVE MOTION Relate Case *Negron v. Google LLC* ) filed byGoogle LLC. (Sessions, Justina) (Filed on 2/16/2021) (Entered: 02/16/2021) |
| 02/23/2021 | 95 | STIPULATION WITH PROPOSED ORDER *JOINT STIPULATION AND [PROPOSED] ORDER REGARDING COMPLAINT RESPONSE DEADLINES* filed by Alphabet Inc., Google LLC. (Sessions, Justina) (Filed on 2/23/2021) (Entered: 02/23/2021) |
| 02/23/2021 | 96 | **ORDER GRANTING 95 STIPULATION REGARDING COMPLAINT RESPONSE DEADLINE. Signed by Judge Beth Labson Freeman on 2/23/2021.Associated Cases: 5:20-cv-03556-BLF, 5:20-cv-04130-BLF, 5:20-cv-08984-BLF, 5:20-cv-09092-BLF, 5:20-cv-09321-BLF, 5:21-cv-00022-BLF(blfle4S, COURT STAFF) (Filed on 2/23/2021) (Entered: 02/23/2021)** |
| 02/25/2021 | 97 | NOTICE of Appearance by Rachel Renee Johnson *for Plaintiffs Vitor Lindo, Michael Stellman, Michael Devaney, Sara Yberra* (Johnson, Rachel) (Filed on 2/25/2021) (Entered: 02/25/2021) |
| 02/25/2021 | 98 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971-15625219.) filed by Hanson Law Firm, PC, Surefreight Global LLC, Mark J. Astarita. (Attachments: # 1 Certificate of Standing)(Radice, John) (Filed on 2/25/2021) (Entered: 02/25/2021) |
| 02/25/2021 | 99 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971-15625490.) filed by Mark J. Astarita, Hanson Law Firm, PC, Surefreight Global LLC. (Attachments: # 1 Certificate of Standing)(Lambert, April) (Filed on 2/25/2021) (Entered: 02/25/2021) |
| 02/25/2021 | 100 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971-15625515.) filed by Mark J. Astarita, Hanson Law Firm, PC, Surefreight Global LLC. (Attachments: # 1 Certificate of Standing)(Tamoshunas, Archana) (Filed on 2/25/2021) (Entered: 02/25/2021) |
| 02/25/2021 | 101 | MOTION to Appoint Lead Plaintiff and Lead Counsel filed by Genius Media Group, Inc., JLASALLE ENTERPRISES LLC, Mikula Web Solutions, Inc., Sterling International Consulting Group, Sweepstakes Today, LLC, The Nation Company, L.P., The Progressive, Inc.. Motion Hearing set for 4/1/2021 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 3/11/2021. Replies due by 3/18/2021. (Attachments: # 1 Declaration of Philip C. Korologos, # 2 Exhibit 1 to Korologos Decl., # 3 Exhibit 2 to Korologos Decl., # 4 Declaration of George A. Zelcs, # 5 Exhibit 1 to Zelcs Decl., # 6 Exhibit 2 to Zelcs Decl., # 7 Declaration of Eric L. Cramer, # 8 Exhibit 1 to Cramer Decl., # 9 Exhibit 2 to Cramer Decl., # 10 Declaration of Robert J. Gralewski, Jr., # 11 Exhibit 1 to Gralewski Decl., # 12 Declaration of Dennis Stewart, # 13 Exhibit 1 to Stewart Decl., # 14 Proposed Order, # 15 Affidavit Filer's Attestation re: Signatures)(Korologos, Philip) (Filed on 2/25/2021) (Entered: 02/25/2021) |
| 02/25/2021 | 102 | MOTION to Appoint Counsel filed by Mark J. Astarita, Hanson Law Firm, PC, Surefreight Global LLC. (Sharp, Dena) (Filed on 2/25/2021) (Entered: 02/25/2021) |
| 02/25/2021 | 103 | MOTION to Appoint Lead Plaintiff and Lead Counsel filed by Nicholas Arrieta, Michael Devaney, Vitor Lindo, Michael Stellman, Sara Yberra. Motion Hearing set for 4/1/2021 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 3/11/2021. Replies due by 3/18/2021. (Attachments: # 1 Declaration Declaration of Tina Wolfson and Exhibit 1, # 2 Proposed Order Proposed |

| | | Order)(Johnson, Rachel) (Filed on 2/25/2021) (Entered: 02/25/2021) |
|---|---|---|
| 03/01/2021 | 104 | Renotice motion hearing re 101 MOTION to Appoint Lead Plaintiff and Lead Counsel filed byGenius Media Group, Inc., JLASALLE ENTERPRISES LLC, Mikula Web Solutions, Inc., Sterling International Consulting Group, Sweepstakes Today, LLC, The Nation Company, L.P., The Progressive, Inc.. (Attachments: # 1 Affidavit Filer's Attestation re Signatures)(Related document(s) 101 ) (Korologos, Philip) (Filed on 3/1/2021) (Entered: 03/01/2021) |
| 03/02/2021 | 105 | **ORDER GRANTING 100 APPLICATION FOR PRO HAC VICE. Signed by Judge Beth Labson Freeman on 3/2/2021.(blflc4S, COURT STAFF) (Filed on 3/2/2021) (Entered: 03/02/2021)** |
| 03/02/2021 | 106 | **ORDER GRANTING 99 APPLICATION FOR PRO HAC VICE. Signed by Judge Beth Labson Freeman on 3/2/2021.(blflc4S, COURT STAFF) (Filed on 3/2/2021) (Entered: 03/02/2021)** |
| 03/02/2021 | 107 | **ORDER GRANTING 98 APPLICATION FOR PRO HAC VICE. Signed by Judge Beth Labson Freeman on 3/2/2021.(blflc4S, COURT STAFF) (Filed on 3/2/2021) (Entered: 03/02/2021)** |
| 03/02/2021 | 108 | **ORDER DENYING 88 MOTION TO RELATE. Signed by Judge Beth Labson Freeman on 3/2/2021.(blflc4S, COURT STAFF) (Filed on 3/2/2021) Modified on 3/2/2021 (blflc4S, COURT STAFF). (Entered: 03/02/2021)** |
| 03/02/2021 | 109 | **ORDER RESETTING CASE MANAGEMENT CONFERENCE TO JUNE 10, 2021 AT 11AM. Signed by Judge Beth Labson Freeman on 3/2/2021. (blflc4S, COURT STAFF) (Filed on 3/2/2021) (Entered: 03/02/2021)** |
| 03/02/2021 | 110 | **ORDER TO SHOW CAUSE WHY RELATED PUBLISHER CASES SHOULD NOT BE CONSOLIDATED. Signed by Judge Beth Labson Freeman on 3/2/2021. (blflc4S, COURT STAFF) (Filed on 3/2/2021) (Entered: 03/02/2021)** |
| 03/03/2021 | | Set Deadlines: re 109 Order Resetting Case Management Conference. Case Management Statement due by 6/3/2021. Initial Case Management Conference set for 6/10/2021 11:00 AM in San Jose, Courtroom 3, 5th Floor. (tshS, COURT STAFF) (Filed on 3/3/2021) (Entered: 03/03/2021) |
| 03/03/2021 | 111 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971−15652263.) filed by Michael Devaney, Vitor Lindo, Michael Stellman, Sara Yberra. (Attachments: # 1 Certificate of Good Standing)(Ferich, Andrew) (Filed on 3/3/2021) (Entered: 03/03/2021) |
| 03/04/2021 | 112 | **ORDER GRANTING 111 APPLICATION FOR PRO HAC VICE. Signed by Judge Beth Labson Freeman on 3/4/2021.(blflc4S, COURT STAFF) (Filed on 3/4/2021) (Entered: 03/04/2021)** |
| 03/10/2021 | 113 | RESPONSE TO ORDER TO SHOW CAUSE by Mark J. Astarita, Genius Media Group, Inc., JLASALLE ENTERPRISES LLC, Mikula Web Solutions, Inc., Sterling International Consulting Group, Sweepstakes Today, LLC, The Nation Company, L.P., The Progressive, Inc. *and Google Defendants*. (Attachments: # 1 Affidavit Filer's Attestation re Signatures)(Korologos, Philip) (Filed on 3/10/2021) (Entered: 03/10/2021) |
| 03/10/2021 | 114 | **ORDER CONSOLIDATING CASES. Signed by Judge Beth Labson Freeman on 3/10/2021. (blflc4S, COURT STAFF) (Filed on 3/10/2021) (Entered: 03/10/2021)** |
| 03/12/2021 | 115 | CLERKS NOTICE CONVERTING MOTION HEARING TO ZOOM WEBINAR HEARING. Motion Hearing as to 103 MOTION to Appoint Lead Plaintiff and Lead Counsel , 102 MOTION to Appoint Counsel , 101 MOTION to Appoint Lead Plaintiff and Lead Counsel . <br><br> Motion Hearing set for 4/1/2021 09:00 AM before Judge Beth Labson Freeman will be held via a Zoom webinar. <br><br> **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/blf |

| | | |
|---|---|---|
| | | **Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than March 30, 2021 at 2:00 PM PST. |
| | | **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. |
| | | **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. |
| | | *(This is a text−only entry generated by the court. There is no document associated with this entry.)* **(tshS, COURT STAFF) (Filed on 3/12/2021) (Entered: 03/12/2021)** |
| 03/17/2021 | 116 | REPLY (re 66 MOTION to Dismiss *First Amended Consolidated Class Action Complaint* ) filed byAlphabet Inc., Google LLC. (Sessions, Justina) (Filed on 3/17/2021) (Entered: 03/17/2021) |
| 03/18/2021 | 117 | OPPOSITION/RESPONSE (re 103 MOTION to Appoint Lead Plaintiff and Lead Counsel , 102 MOTION to Appoint Counsel ) *Reply Re Motion for Lead Counsel* filed byVitor Lindo. (Johnson, Rachel) (Filed on 3/18/2021) (Entered: 03/18/2021) |
| 04/01/2021 | 118 | TRANSCRIPT ORDER for proceedings held on 04/01/2021 before Judge Beth Labson Freeman by Vitor Lindo, for Court Reporter Summer Fisher. (Wolfson, Tina) (Filed on 4/1/2021) (Entered: 04/01/2021) |
| 04/01/2021 | 119 | Transcript of Proceedings held on 04/01/2021, before Judge Beth Labson Freeman. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re (118 in 5:20−cv−03556−BLF) Transcript Order ) Redaction Request due 4/22/2021. Redacted Transcript Deadline set for 5/3/2021. Release of Transcript Restriction set for 6/30/2021. (Fisher, Summer) (Filed on 4/1/2021) (Entered: 04/01/2021) |
| 04/02/2021 | 120 | TRANSCRIPT ORDER for proceedings held on 04/01/2021 before Judge Beth Labson Freeman by Alphabet Inc., Google LLC, for Court Reporter Summer Fisher. (Sessions, Justina) (Filed on 4/2/2021) (Entered: 04/02/2021) |
| 04/02/2021 | 121 | TRANSCRIPT ORDER for proceedings held on 4/1/2021 before Judge Beth Labson Freeman for Court Reporter Summer Fisher. (sp, COURT STAFF) (Filed on 4/2/2021) (Entered: 04/02/2021) |
| 04/02/2021 | 122 | TRANSCRIPT ORDER for proceedings held on 4/1/2021 before Judge Beth Labson Freeman by Sterling International Consulting Group, for Court Reporter Summer Fisher. (Rios, Sophia) (Filed on 4/2/2021) (Entered: 04/02/2021) |
| 04/02/2021 | 123 | **CLERKS NOTICE CONVERTING MOTION HEARING TO ZOOM WEBINAR HEARING. Motion to Dismiss Hearing set for 4/8/2021 09:00 AM before Judge Beth Labson Freeman will be held via a Zoom webinar.** |
| | | **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/blf |
| | | **Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than April 6, 2021 at 2:00 PM PST. |
| | | **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is |

| | | absolutely prohibited. |
|---|---|---|
| | | *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (tshS, COURT STAFF) (Filed on 4/2/2021) (Entered: 04/02/2021) |
| 04/02/2021 | 124 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Motion Hearing held on 4/1/2021.Oral argument heard. The Court takes the matter under submission, written order to be issued.** **Total Time in Court: 9:42 − 10:24 (41 Minutes).** **Court Reporter: Summer Fisher.** **Plaintiff Attorney: Rachel Johnson, Dena Sharp, David Mitchell, Steve Jodlowski, Caitlin Cossett, Abby Dennis, Carol O'Keefe, Tina Wolfson via Zoom Webinar.** **Defendant Attorney: Justina sessions via Zoom Webinar.** *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (tshS, COURT STAFF) (Date Filed: 4/2/2021) (Entered: 04/02/2021) |
| 04/08/2021 | 125 | TRANSCRIPT ORDER for proceedings held on April 8, 2021 before Judge Beth Labson Freeman by Alphabet Inc., Google LLC, for Court Reporter Lee−Anne Shortridge. (Sessions, Justina) (Filed on 4/8/2021) (Entered: 04/08/2021) |
| 04/08/2021 | 126 | TRANSCRIPT ORDER for proceedings held on 4/8/2021 before Judge Beth Labson Freeman by Mark J. Astarita, Hanson Law Firm, PC, Surefreight Global LLC, for Court Reporter Lee−Anne Shortridge. (Sharp, Dena) (Filed on 4/8/2021) (Entered: 04/08/2021) |
| 04/08/2021 | 127 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Motion Hearing held on 4/8/2021.** **Total Time in Court: 9:14 − 10:45 (1 Hour 31 Minutes).** **Court Reporter: Lee−Anne Shortridge.** **Plaintiff Attorney: Dena Sharp, Jordan Elias, Tina Wolfson, Rachel Johnson via Zoom Webinar.** **Defendant Attorney: Justina Sessions, Jonathan Jacobson, Mara Boundy via Zoom Webinar.** *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (tshS, COURT STAFF) (Date Filed: 4/8/2021) (Entered: 04/12/2021) |
| 04/12/2021 | 128 | TRANSCRIPT ORDER for proceedings held on 04/08/2021 before Judge Beth Labson Freeman by Sweepstakes Today, LLC, for Court Reporter Lee−Anne Shortridge. (Mitchell, David) (Filed on 4/12/2021) (Entered: 04/12/2021) |
| 04/12/2021 | 129 | MOTION to Appoint Counsel *Application of Derriel McCorvey for Appointment to Plaintiffs' Steering Committee* filed by Organic Panaceas, LLC. (McCorvey, Derriel) (Filed on 4/12/2021) (Entered: 04/12/2021) |
| 04/12/2021 | 130 | NOTICE by Hanson Law Firm, PC, Vitor Lindo, Surefreight Global LLC *Regarding Advertising Plaintiffs' Proposal Concerning Appointment of Interim Class Counsel* (Attachments: # 1 Exhibit A− Proposed Order Regarding Appointment of Counsel, # 2 Exhibit B − Proposed Order Regarding Discovery Coordination Committee, # 3 Exhibit C− Protocol for Interim Class Counsels Time and Expense Submission)(Sharp, Dena) (Filed on 4/12/2021) (Entered: 04/12/2021) |
| 04/13/2021 | 131 | TRANSCRIPT ORDER for proceedings held on 4/8/2021 before Judge Beth Labson Freeman by Sterling International Consulting Group, for Court Reporter Lee−Anne Shortridge. (Rios, Sophia) (Filed on 4/13/2021) (Entered: 04/13/2021) |
| 04/16/2021 | 132 | TRANSCRIPT ORDER for proceedings held on 4/8/2021 before Judge Beth Labson Freeman for Court Reporter Lee−Anne Shortridge. (sp, COURT STAFF) (Filed on 4/16/2021) (Entered: 04/16/2021) |
| 04/26/2021 | 133 | **ORDER REGARDING APPOINTMENT OF COUNSEL. Signed by Judge Beth Labson Freeman on 4/26/2021. (blflc4S, COURT STAFF) (Filed on 4/26/2021) (Entered: 04/26/2021)** |

| 04/26/2021 | 134 | **ORDER ESTABLISHING A PLAINTIFFS DISCOVERY COORDINATION COMMITTEE. Signed by Judge Beth Labson Freeman on 4/26/2021. (blflc4S, COURT STAFF) (Filed on 4/26/2021) (Entered: 04/26/2021)** |
|---|---|---|
| 04/26/2021 | 135 | **MODIFIED PROTOCOL FOR INTERIM CLASS COUNSELS TIME AND EXPENSE SUBMISSIONS. Signed by Judge Beth Labson Freeman on 4/26/2021. (blflc4S, COURT STAFF) (Filed on 4/26/2021) (Entered: 04/26/2021)** |
| 04/26/2021 | 136 | **ORDER DIRECTING PLAINTIFF IN 21–CV–2629 TO FILE RELATION MOTION. Signed by Judge Beth Labson Freeman on 4/26/2021. (blflc4S, COURT STAFF) (Filed on 4/26/2021) (Entered: 04/26/2021)** |
| 04/28/2021 | 137 | ADMINISTRATIVE MOTION Relate Case No. 21–cv–02629 to Master File No. 5:20–cv–03556–BLF filed by Organic Panaceas, LLC. Responses due by 5/3/2021. (Attachments: # 1 Declaration Declaration of D. McCorvey, # 2 Proposed Order)(Gregory, Philip) (Filed on 4/28/2021) (Entered: 04/28/2021) |
| 04/30/2021 | 138 | NOTICE by Alphabet Inc., Google LLC re 62 Response ( Non Motion ) *Notice re Filing MDL Motion* (Attachments: # 1 Exhibit Motion, # 2 Exhibit Brief)(Sessions, Justina) (Filed on 4/30/2021) (Entered: 04/30/2021) |
| 05/05/2021 | 139 | **ORDER RELATING CASES AND TO SHOW CAUSE ON CONSOLIDATION. Signed by Judge Beth Labson Freeman on 5/5/2021.(blflc4S, COURT STAFF) (Filed on 5/5/2021) (Entered: 05/05/2021)** |

1  Dena C. Sharp (State Bar No. 245869)
   Jordan Elias (State Bar No. 228731)
2  Adam E. Polk (State Bar No. 273000)
   Scott M. Grzenczyk (State Bar No. 279309)
3  **GIRARD SHARP LLP**
4  601 California Street, Suite 1400
   San Francisco, CA 94108
5  Tel: (415) 981-4800
6  Fax: (415) 981-4846
   dsharp@girardsharp.com
7  jelias@girardsharp.com
   apolk@girardsharp.com
8  scottg@girardsharp.com
9
   Tina Wolfson (State Bar No. 174806)
10 Theodore W. Maya (State Bar No. 223242)
   Rachel Johnson (State Bar No. 331351)
11 **AHDOOT & WOLFSON, PC**
12 2600 West Olive Avenue, Suite 500
   Burbank, CA 91505
13 Tel: (310) 474-9111
   Fax: (310) 474-8585
14 twolfson@ahdootwolfson.com
15 tmaya@ahdootwolfson.com
   rjohnson@ahdootwolfson.com
16
17 *Attorneys for Plaintiffs*
18 [Additional Counsel Listed on Signature Page]

19

20                     **UNITED STATES DISTRICT COURT**
                       **NORTHERN DISTRICT OF CALIFORNIA**
21                           **SAN JOSE DIVISION**

22 | IN RE GOOGLE DIGITAL ADVERTISING | Case No. 5:20-cv-03556-BLF |
23 | ANTITRUST LITIGATION | |
   | | **FIRST AMENDED CONSOLIDATED** |
24 | | **CLASS ACTION COMPLAINT** |
25 | | |
   | | **DEMAND FOR JURY TRIAL** |
26 | | |
27 | | Hon. Beth Labson Freeman |
28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

Case 1:21-cv-06796-PKC   Document 24-1   Filed 05/14/21   Page 23 of 74
Case MDL No. 3010   Document 10-1   Filed 05/12/21   Page 23 of 74

Case 5:20-cv-03556-BLF   Document 52   Filed 12/04/20   Page 2 of 53

1    Plaintiffs, on behalf of themselves and all others similarly situated, bring this first amended

2  consolidated class action complaint for equitable relief and treble damages under the Sherman

3  Antitrust Act, 15 U.S.C. § 2, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

4  **I.    NATURE OF THE ACTION**

5    1.    Over the past several years, Google leveraged its monopoly in online search and search

6  advertising to acquire an illegal monopoly in brokering display advertising—the placement of

7  advertisements on other companies' websites. Google gained this market dominance in part by

8  acquiring rivals in the online advertising space, conditioning access to its search-results data and

9  YouTube video advertising platform upon the purchase of its separate display advertising services, and

10  making its intermediation systems incompatible with those of its competitors. Google's scheme to

11  monopolize the market for brokering display advertising has vastly reduced competition in the

12  purchase and placement of this advertising and resulted in economic harm to advertisers and

13  publishers alike.

14    2.    Forty-nine state attorneys general are currently conducting antitrust investigations of

15  Google's conduct in digital advertising markets, and the United States Department of Justice and

16  eleven state attorneys general recently filed a civil antitrust action against Google for unlawfully

17  maintaining monopolies in the markets for online search and search advertising.

18    3.    Because of its pervasive monopoly conduct, Google now controls the "ad tech stack"

19  comprising the intermediary services between advertisers, which pay to place digital advertisements,

20  and publishers paid to publish those ads on their websites. Companies that wish to place or publish

21  online advertisements have little choice but to pay Google for its advertising services, including

22  instantaneous auctions, and Google's exclusion of competition in this intermediation market has

23  enabled it to favor its own advertising platforms. Google's extraction of monopoly rents through fees

24  charged to both advertisers and publishers has resulted in higher prices paid by advertisers, higher

25  consumer prices, and lower payments to publishers of online display advertisements.

26    4.    Like the other class members, Plaintiffs dealt directly with Google in its capacity as

27  display advertising broker, having placed online display and search advertisements using Google's

28

1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

Case 1:21-cv-06796-PKC Document 24-1 Filed 05/14/21 Page 24 of 74
Case MDL No. 3010 Document 10-1 Filed 05/12/21 Page 24 of 74

Case 5:20-cv-03556-BLF Document 52 Filed 12/04/20 Page 3 of 53

1  services. Plaintiffs, like the other class members, suffered economic losses as a result of Google's
2  monopolization and seek appropriate equitable relief and damages through this action.

3  **II.    JURISDICTION AND VENUE**

4       5.    This Court has original jurisdiction over Plaintiffs' federal antitrust claim under the
5  Clayton Act, 15 U.S.C. § 15. The Court also has diversity jurisdiction over this action under the Class
6  Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse
7  citizenship from Defendants, there are more than 100 class members nationally, and the aggregate
8  amount in controversy exceeds $5,000,000.

9       6.    Venue is proper in this District under 28 U.S.C. § 1391. Google's principal place of
10  business is in this District, and it regularly conducts business here. A substantial part of the events
11  giving rise to Plaintiffs' causes of action occurred in or emanated from this District.

12       7.    Assignment to the San Jose Division is appropriate under Local Rule 3-2(c) because a
13  substantial part of the conduct at issue in this case occurred in Santa Clara County.

14  **III.    PARTIES**

15       **A.    Plaintiffs**

16            **1.    Hanson Law Firm, PC**

17       8.    Plaintiff Hanson Law Firm, PC is a law firm based in San Francisco, California. During
18  the class period, Hanson Law Firm paid Google directly to broker the placement of its display
19  advertisements on third-party websites.

20       9.    Hanson Law Firm paid Google $487.78 between June 2016 and September 6, 2016 for
21  these intermediation services.

22       10.    From June 1, 2016 to September 6, 2016, Hanson Law Firm's display advertising for its
23  legal services appeared on 992 different websites a total of 689,876 different times. These websites
24  ranged from news organizations that included the *Los Angeles Times*, *Daily Beat*, and *Vanity Fair* to
25  dating websites such as Match.com, as well as information sites like Wikihow.com.

26       11.    During the class period, Hanson Law Firm also paid Google for AdWords advertising
27  connected to various searches performed using Google's internet search engine.

28
                                                    2
                        FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                     CASE NO. 5:20-cv-03556-BLF

Case 1:21-cv-06796-PKC   Document 24-1   Filed 05/14/21   Page 25 of 74
Case MDL No. 3010   Document 10-1   Filed 05/12/21   Page 25 of 74

Case 5:20-cv-03556-BLF   Document 52   Filed 12/04/20   Page 4 of 53

12.     Hanson Law Firm placed display ads as well as search ads to expand the reach of its online advertising to include potential clients who may not have specifically searched the web for relevant topics or legal services, and to optimize its re-marketing to users who had already visited its website or clicked on its ad and to those who carried a similar "cookie" profile.

13.     Hanson Law Firm sustained antitrust injury by paying supra-competitive prices to Google to broker the placement of its display advertisements on third-party websites. These anticompetitive overcharges directly and proximately resulted from Google's monopolization of the relevant market, defined in Part VI below.

2.     **Surefreight Global LLC d/b/a Prana Pets**

14.     Plaintiff Surefreight Global LLC d/b/a Prana Pets is an herbal remedy company based in Delray Beach, Florida and incorporated under Florida law.  During the class period, Prana Pets paid Google directly to broker the placement of its display advertisements on third-party websites, including sites geared to dog owners.

15.     Prana Pets paid Google $972.80 between August 2016 and July 2018, and $2,040.00 between February 2019 and December 2020, for these intermediation services.

16.     During the class period, Prana Pets also paid Google for AdWords advertising connected to various searches performed using Google's internet search engine.

17.     Prana Pets placed display ads as well as search ads to expand the reach of its online advertising to include consumers who may not have specifically searched the web for relevant products, and to optimize its re-marketing to users who had already visited its website or clicked on its ad and to those who carried a similar "cookie" profile.  Prana Pets' display ads included branding and product-specific banner ads.

18.     Prana Pets sustained antitrust injury by paying supra-competitive prices to Google to broker the placement of its display advertisements on third-party websites.  These anticompetitive overcharges directly and proximately resulted from Google's monopolization of the relevant market.

3.     **Vitor Lindo**

19.     Plaintiff Vitor Lindo is a citizen and resident of Georgia and a photographer based in

3

1   Pembroke, Georgia. During the class period, Mr. Lindo paid Google directly to broker the placement
2   of its display advertisements on third-party websites, including sites associated with wedding services.

3       20.     Mr. Lindo paid Google $21,971.45 between 2016 and 2019 for these intermediation
4   services.

5       21.     During the class period, Mr. Lindo also paid Google for AdWords advertising connected
6   to various searches performed using Google's internet search engine.

7       22.     Mr. Lindo placed display ads as well as search ads to expand the reach of his online
8   advertising to include consumers who may not have specifically searched the web for topics or services
9   relating to wedding photography, and to optimize re-marketing to users who had already visited his
10  website or clicked on its ad and to those who carried a similar "cookie" profile.

11      23.     Mr. Lindo sustained antitrust injury by paying supra-competitive prices to Google to
12  broker the placement of its display advertisements on third-party websites. These anticompetitive
13  overcharges directly and proximately resulted from Google's monopolization of the relevant market.

14      **B.      Defendants**

15      24.     Defendant Google LLC is a limited liability company organized under the laws of
16  Delaware with its principal place of business in Mountain View, California. Google LLC is a
17  technology company that provides internet-related services and products, including online advertising
18  technologies and a search engine.

19      25.     Defendant Alphabet Inc. is a corporation organized under the laws of Delaware with its
20  principal place of business in Mountain View, California. Google LLC is a wholly-owned subsidiary
21  of Alphabet.

22      26.     Google LLC and Alphabet Inc. are collectively referred to herein as "Google."

23  **IV.    FACTUAL ALLEGATIONS**

24      **A.      Overview of Digital Advertising**

25      27.     Businesses have long relied on advertising to promote their products, generate brand
26  awareness, and increase sales. Before the internet age, advertising campaigns were planned and
27  managed by media buyers. If a media buyer needed to help a toy manufacturer reach parents of

28

4

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

Case 1:21-cv-06796-PKC  Document 24-1  Filed 05/14/21  Page 27 of 74
Case MDL No. 3010  Document 10-1  Filed 05/12/21  Page 27 of 74

Case 5:20-cv-03556-BLF  Document 52  Filed 12/04/20  Page 6 of 53

1    children, she might place an ad in *Parents Magazine*, or in the family section of the local newspaper.

2    28.    Digital advertising today works differently. The internet allows businesses to target

3    potential customers with greater precision. Digital advertising is the promotion of products and

4    services via the internet through search engines, websites, social media, and other platforms that can be

5    accessed online. It is automated and data-driven, involving data scientists, mathematicians, and

6    computer programmers who, behind the scenes, use advanced statistical tools to optimize advertising

7    campaigns, micro-targeting users and constantly tweaking algorithms.

8    29.    Digital advertising is now the fastest growing segment of the advertising business in the

9    United States. More than half of all advertising money in the United States is now spent on digital

10   advertising—approximately $129 billion in 2019.

11   30.    The two overarching markets in digital advertising are search advertising and display

12   advertising.

13   31.    Search advertising is the placement of advertisements above or alongside the organic

14   search results generated by a search engine, predominately Google Search. The advertisement targets

15   those who are actually searching for a product or service; the advertisement appears when a consumer

16   performs a search that has a connection to the product or service offered by company sponsoring the

17   advertisement. The advertiser pays when the user clicks on the advertisement, based on a cost per

18   click. For example, if a user searches for sandwich delivery, the search advertising results may look

19   like this:



5

Case 1:21-cv-06796-PKC   Document 24-1   Filed 05/14/21   Page 28 of 74
Case MDL No. 3010   Document 10-1   Filed 05/12/21   Page 28 of 74

Case 5:20-cv-03556-BLF   Document 52   Filed 12/04/20   Page 7 of 53

32.     Search advertising is designed to reach customers who have already shown an interest in purchasing a product or service and may be close to making a purchasing decision. If, for example, a person finds herself locked out of her house and searches for nearby locksmiths on Google Search, search advertising will place ads for local locksmith services above the organic search results.

33.     Search advertising is limited, however, to prospective customers who affirmatively search for the advertiser's product or service or for something similar, or who input a related term.

34.     Display advertising, in contrast, is the advertising that appears next to content on websites. Unlike search advertising, which is generally limited to text, display advertising comes in many forms, including banners, images, and videos. For instance, an ad for Dove soap might appear as a banner or sidebar on the cooking website "myrecipes":



Or as side bar ads, like this:



35.     With display advertising, the internet user need not perform a specific search for the particular product or service. Instead, the key to effective display ads is placing them on websites likely to be viewed by the advertiser's target audience or by those most likely to purchase the advertised products or services. A running shoe company, for example, would prefer to have its advertisements appear on sporting goods websites rather than websites selling car parts. In that

6

Case 1:21-cv-06796-PKC   Document 24-1   Filed 05/14/21   Page 29 of 74
Case MDL No. 3010   Document 10-1   Filed 05/12/21   Page 29 of 74

Case 5:20-cv-03556-BLF   Document 52   Filed 12/04/20   Page 8 of 53

1   scenario, even users who have not searched for running shoes will see the running shoe company's
2   advertisement if they visit a website that publishes it.

3       36.    Suppliers of display advertising are website operators and are known as publishers (*e.g.*,
4   providers of online news sites and other content creators). Publishers employ third-party tools to find
5   advertisers willing to purchase advertising space available on their websites.

6       37.    In 2019, $69.9 billion was spent on digital display advertising in the United States; 85%
7   of that display marketing was advertising, 90% of which was executed through "programmatic," or
8   automated, real-time bidding. In 2020, spending on display media is expected to reach $81.3 billion, a
9   14% year-over-year increase.

10       38.    Display advertising accounts for approximately half of the digital advertising market,
11   and many web publishers rely on display advertising for a major source of their revenue.

12       39.    As discussed in further detail below, search advertising and display advertising serve
13   different purposes, and advertisers do not regard them as substitutes for each other. The Interactive
14   Advertising Bureau—an advertising organization that develops industry standards and conducts
15   research for the advertising industry—separates display and search for purposes of gathering and
16   reporting annual revenues in these two advertising markets.

17   **B.**    **Google Dominates and Controls Digital Advertising Services Markets**

18       40.    Google is the dominant supplier in the search advertising market and has moved rapidly
19   to control all stages of the display advertising market, as well. In 2019, Google's corporate parent
20   Alphabet earned $135 billion, 84% of its total revenue, from search and display advertising.

21       41.    Google's revenue derived from display advertising comes from ads placed on Google's
22   own properties (Google Maps, Gmail, etc.) and from acting as an intermediary in the sale of ad space
23   on third-party websites to advertisers.

24       42.    One of Google's key sources of revenue derives from its activities as the broker
25   between publishers and advertisers in programmatic display advertising. When an ad is viewed on a
26   third-party publisher's site, such as the *New York Times* website, Google pays the publisher a share of
27   the amount the advertiser paid to Google. The amount of revenue Google earns from display

28

7

1    advertising is dependent on the number of ads it sells, the price of those ads, and Google's percentage
2    margin or "cut" of the deal, also known as the "take rate."

3        43.    The "take rate" is the difference between what an advertiser pays for an ad and what
4    portion of that payment the publisher of the ad receives for placing the ad on its website. Google's
5    take rate as an intermediary is typically 54-61%. When ads are presented on Google products, such as
6    Google Search or YouTube, Google keeps the entire price of the ad.

7        44.    Google has a strong economic incentive to increase the number of ads placed on its
8    proprietary sites, to charge advertisers higher prices, and to pay as little as possible to publishers
9    displaying ads placed through Google on their websites.

10       **1.    Google's Search Advertising Practices and Market Share**

11       45.    As the owner of the dominant online search platform, Google is by far the largest
12   supplier of digital search advertising in the United States. Over the last ten years, Google's share of
13   the digital search advertising supply has ranged between 89% and 93%.

14       46.    Google makes space on its search results pages available to advertisers through an
15   auction process that occurs each time a user runs a search. Google starts the auction by first finding all
16   the ads with keywords matching the search. It then excludes ads that are considered ineligible based
17   on certain criteria, such as country restrictions. Google then only displays ads with a sufficiently high
18   "rank" based on a combination of factors, such as the advertiser's bid, the quality of the ad, user
19   location, and the device the user is using. Because the auction process is repeated for every search
20   performed on Google Search, different auctions may lead to different advertisements being displayed.

21       47.    Although Google claims that it prices its search advertising through an auction, Google
22   controls (and frequently raises) the price of its search advertising by setting a high reserve price.
23   Doing so enables Google to directly set the price of its search advertisements because an ad will not
24   sell unless its price meets or exceeds the reserve price, which thus operates as a floor. A majority of
25   the winning bids for Google Search ads are at the reserve price.

26       **2.    Google's Dominance in the Ad Tech Stack and Display Advertising**

27       48.    Google is also a major supplier of programmatic display advertising and owns multiple

28
                                            8

                    FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                              CASE NO. 5:20-cv-03556-BLF

Case 1:21-cv-06796-PKC   Document 24-1   Filed 05/14/21   Page 31 of 74
Case MDL No. 3010   Document 10-1   Filed 05/12/21   Page 31 of 74

Case 5:20-cv-03556-BLF   Document 52   Filed 12/04/20   Page 10 of 53

1   products that supply it. Google captures well over 50% of the market across the ad tech stack—the set
2   of intermediary exchanges and platforms that advertisers and publishers use to buy, sell, and place
3   display ads ("intermediation" services). Google runs the leading ad exchange, while also running buy-
4   side and sell-side intermediary platforms trading on this exchange.

5       49.    YouTube, owned by Google, alone accounts for about 10% of the entire supply of
6   display advertising. Other major Google products, such as Google Maps and Google Play, also offer
7   display advertisements.

8       50.    Approximately 86% of online display advertising space in the United States is bought
9   and sold in real time on electronic trading venues, referred to in the industry as "advertising exchanges"
10   or programmatic real-time bidding. Google owns and operates the dominant ad exchanges.

11       51.    The role of the ad exchange is critical in display advertising. Exchange transactions are
12   the means by which website publishers monetize the attention they earn from web users and advertisers
13   can maximize the impact of their ad spend. A competitive and transparent ad exchange is therefore
14   essential to parties on both sides of the ad stack.

15       52.    Relying on intermediaries like Google that route buy and sell orders from advertisers
16   and publishers, the structure of the ad market resembles the structure of electronically traded financial
17   markets. Just as individual investors trade on financial exchanges through an intermediary brokerage
18   firm, so must publishers and advertisers go through a computerized intermediary to trade on advertising
19   exchanges. But in display advertising, a single company, Google, simultaneously functions as the key
20   intermediary through which buyers (advertisers) and suppliers (publishers) of display advertising trade,
21   and as a leading publisher of advertisements in its own right.

22       53.    On the buy-side, advertisers use specialized software made either for small or large
23   advertisers. Smaller advertisers, such as a local dry cleaner, typically use Google Ads, a self-serve
24   online buying tool. Google Ads will bid on and buy ad space, including available inventory trading on
25   Google's exchange, in an automated fashion on the dry cleaner's behalf. But in this process, Google
26   can ultimately be the advertiser's counterparty instead of its neutral agent.

27

28

<div align="center">9

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF</div>

Case 1:21-cv-06796-PKC   Document 24-1   Filed 05/14/21   Page 32 of 74
Case MDL No. 3010   Document 10-1   Filed 05/12/21   Page 32 of 74

Case 5:20-cv-03556-BLF   Document 52   Filed 12/04/20   Page 11 of 53

54. When an internet user clicks to visit a web page, in the milliseconds that it takes for that page to load, real-time auctions are occurring in the background to determine which ads will display on the web page *that particular user* will see. These auctions are run by supply-side platforms (SSPs), exchanges, and demand-side platforms (DSPs) in the ad tech stack.

55. On the supply side of the exchange, suppliers—online publishers—of display advertising employ publisher ad servers (PAS) to accept, store, and manage ads; choose where and when ads appear; and track the effectiveness of ad campaigns. Each specific ad placement is determined based on bids from advertisers and/or preexisting arrangements between publishers and advertisers. Publishers rely on supply-side platforms (SSPs) to run auctions, interface directly with their demand-side equivalents, and optimize available inventory.

56. The demand side is comprised of advertisers and media agencies running advertising campaigns for businesses. Advertisers and media agencies rely on advertiser ad servers (AAS) to store ads, deliver them to publishers, and record transactions. Advertisers and media agencies also employ demand-side platforms (DSPs) to purchase digital advertising by bidding in auctions and to manage their bids.

57. The DSP connects to an ad exchange, which combines inventory from ad networks and SSPs with third-party data from a data management platform or data broker. When an ad space on a publisher's site becomes available, the ad exchange holds an auction in which the DSP bids on the impression submitted by the ad network or SSP.

58. Together, the publisher ad servers (PAS), supply-side platforms (SSP), advertiser ad servers (AAS), and demand-side platforms (DSP) comprise what is known as the "ad tech stack." By connecting publishers and advertisers, an ad tech provider functions as an intermediary broker. The U.K.'s Competition and Markets Authority (CMA) depicted this market as follows:



10

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

59.     Until fairly recently, different firms provided the various services in the ad tech stack, and intermediaries did not own publishers or advertisers. Google lagged behind the pace of innovation and was not a key player in the development of online ad exchanges. Early players in virtual ad auctions recognized it was most efficient to interoperate with competitors and maintain a level playing field so that customers could mix and match products. During Senate testimony on September 15, 2020, digital marketing expert Adam Heimlich compared transacting in those earlier auctions to "owning a stall in a vast open air market"—transparency was at a level where market participants could easily compare features, quality, and price with those of other participants within reach, and could use ad stack services provided by a variety of providers. This is no longer the case. After a series of acquisitions, Google now dominates and controls the ad stack as a whole.

60.     Before Google's entry, ad exchanges generally operated as disinterested brokers, similar to stock exchanges. Google saw the market efficiency of these early exchanges as a threat to its primary business of selling ads. It soon turned to a sustained mergers and acquisitions strategy to gain market dominance. Google's acquisitions gave it access to and made it a major player at every level of the display advertising service industry, and have enabled Google to exclude competition through a variety of anticompetitive policies and activities.

61.     Since 2007, Google has made numerous key acquisitions in the interest of taking control of the entire ad tech stack. Through these acquisitions, Google absorbed competing firms to avoid competing with them with the purpose and effect of building and consolidating its monopoly.

62.     In 2007, Google purchased the leading ad server, DoubleClick, which provided the basic technology for Google's current PAS. In 2009, Google acquired AdMob, the largest ad server for the then-nascent mobile application market, which has since grown exponentially. The technology from Invite Media, which Google acquired in 2010, was re-launched in 2012 as DoubleClick Bid Manager and eventually converted into Google's main DSP, Display & Video 360. In 2011, Google purchased AdMeld, one of the largest SSPs in the display advertising industry, which it integrated into AdX, Google's existing exchange. And in 2014, Google bought Adometry, an analytics and attribution provider it then integrated into Google Analytics. Together, these acquisitions reveal a

11

1   business objective of occupying the entire ad stack and the connected analytics market through buying
2   up the competition.

3       63.     When Google purchased DoubleClick, the Federal Trade Commission accepted
4   Google's representations that it would not leverage its control of publishers' primary ad server to
5   distort competition in the electronic ad-trading market. Google promised to manage the conflicts of
6   interest, including from enhanced access to user data, that would result from the acquisition. Google's
7   general counsel assured Congress that DoubleClick "data is owned by the customers, publishers and
8   advertisers, and DoubleClick or Google cannot do anything with it."

9       64.     FTC Commissioner Pamela Jones Harbour dissented from the FTC's approval of the
10   acquisition, warning in part that if Google and DoubleClick were permitted to merge without
11   conditions, the new combination could merge Google and DoubleClick data to the detriment of
12   consumer privacy and competition. Commissioner Harbour stated that the merger could "profoundly
13   alter the 21st century Internet-based economy—in ways we can imagine, and in ways we cannot." She
14   expressed concern about "the privacy interests of consumers" and wrote that she was "uncomfortable
15   accepting the merging parties' nonbinding representations at face value."

16       65.     In approving Google's acquisition of DoubleClick, the FTC rejected prescient concerns
17   about data and competition raised by Commissioner Harbour and public interest groups. An April 14,
18   2007 news article in the *New York Times* noted that Google's DoubleClick division would have
19   conflicts of interest with Google's exchange, but suggested publishers and advertisers might simply
20   "jump ship" if Google leveraged the acquisition "to further its own ad network."

21       66.     When Google did leverage the DoubleClick acquisition to further its ad network, instead
22   of turning to other ad tech providers, increasing numbers of publishers and advertisers concluded they
23   had no choice but to rely on Google to broker display-ad placement.

24       67.     In 2009, Google restricted the ability of publishers and advertisers participating in its
25   exchange to access their DoubleClick data, reserving an essential information advantage for its own
26   trading divisions.

27

28                                              12

                  FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                              CASE NO. 5:20-cv-03556-BLF

68. In 2016, moreover, Google broke a key promise it made to the FTC to push through the DoubleClick acquisition: Google began merging DoubleClick web-browsing data with personal information collected through other Google services, combining information linked to a user's personal identity with their location on Google Maps, information from their Gmail records, and their Google search histories, along with user information obtained from other Google products. With this step, Google eliminated the barrier between the data that Google gathered from cookies tracking users' online behavior and the personal information Google held from its users' accounts. Its digital advertising monopolies enabled Google to make this momentous shift in data policy without risk of losing business to rivals more protective of consumer privacy.

69. In approving Google's 2010 acquisition of AdMob, the leading mobile ad network at the time, the FTC acknowledged that "the combination of the two leading mobile advertising networks raised serious antitrust issues." Yet the FTC deemed those concerns "overshadowed by recent developments in the market," in particular a move by Apple to "launch its own, competing mobile ad network." The FTC approved Google's acquisition of AdMob based on the assumption that Apple would continue to build its presence in the mobile ad market. But that assumption was incorrect— Apple's product failed to gain traction and in 2016 Apple abandoned its attempt to develop a competing mobile ad network.

70. By 2015, Google's acquisitions had given it monopoly power in the display advertising services market, and the early exchanges that had initially outperformed Google were selling at a discount price or had folded. The market shares of the DSPs that once led that market segment declined in parallel.

71. Documents that Google produced to the House Subcommittee on Antitrust, Commercial, and Administrative Law show that Google acquired companies to absorb its competition and combine products along the ad stack instead of competing on the merits. An internal Google presentation from July 2006 included a slide titled "Build a Self-Reinforcing Online Ads Ecosystem," which noted in part that acquiring DoubleClick or Atlas could create "self-reinforcing benefits" for Google's integrated ad business. The slide asked, "[I]s there some framework we have to demonstrate

13

1    the synergies/inter-relationships from owning all these pieces?"

2        72.    In an internal email from 2010, discussing Google's potential development of a
3    demand-side platform for advertising agencies (a "bidder"), the executive in charge of Google's
4    display business wrote: "The primary benefits on having a bidder are eliminating the disintermediation
5    risk and substantially increasing display spend with Google from agencies (through the combined use
6    of DFA – bidder – AdX). . . . We are looking at options to accelerate this (potentially through M&A
7    for example)."

8        73.    DFA refers to Google's ad server; AdX was Google's exchange. The
9    "disintermediation risk" that Google sought to eliminate resulted from the competitive, transparent
10   conditions in the display advertising exchange market at the time, which diverted ad money away from
11   Google. Thus, Google's plan was to *combine* products to increase its revenue from "display spend"
12   and lock in bidders to its new and consolidated intermediation services.

13       74.    Google's merge-to-monopolize strategy worked. On the supply side, Google now holds
14   at least 90% of the PAS submarket through multiple products such as Google Ad Manager and Google
15   DoubleClick for Publishers. Since taking the dominant position in the PAS submarket, Google began
16   merging its supply-side intermediation products with its PAS offering. The composite product "Google
17   Ad Manager" combined Google's PAS with its associated ad exchange. For the SSP and associated ad
18   exchange submarket, Google holds a 50-60% share. On the demand side, Google also controls a
19   substantial majority of the DSP submarket. Google has a 55% market share of the ad-exchange
20   submarket, far more than the second-place company, AppNexus, which has a 11% share of that
21   submarket. And Google's DSP holds a 50% share of the DSP submarket, with AOL a distant second at
22   12%. Google holds an 80-90% share of the AAS submarket as well.

23       75.    Because of Google's market dominance, publishers and advertisers have little choice but
24   to use Google's intermediation services. Nexstar Media Group, Inc., the nation's largest local news
25   company, tested what would happen if it stopped using Google's technology to place ads on its
26   websites. Over just a few days, the company's video-ad sales plummeted.

27

28                                           14

                    FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                              CASE NO. 5:20-cv-03556-BLF

1    76.    Google further consolidated its monopoly across the ad tech stack through a series of

2    product mergers, whereby it bundled two distinct products together and rebranded the integrated entity

3    as a single product. Google blurred the distinction between its ad server and exchange by reclassifying

4    its ad-serving revenues in its shareholder reports and by merging the two into a single new product that

5    it named Google Ad Manager. Google then merged its AAS with its DSP to create Display & Video

6    360. Each of these mergers increased switching costs for advertisers—and barriers to entry for

7    competitors—for services that already carried high switching costs.

8    C.    **Google Used Its Market Power to Acquire and Maintain a Monopoly for Display**

9    **Advertising Services**

10    1.    **Google Leveraged Its Dominance in Search and Search Advertising and Its**

11    **Control of User Data to Gain a Monopoly in Brokering Display Advertising**

12    77.    Google operates the default internet search platform in the United States. More than

13    90% of all internet searches are conducted through Google Search. Further, Google's web browser,

14    Google Chrome, occupies about half of the U.S. browser market.

15    78.    Google has long monetized its monopoly in search by selling search advertising—digital

16    ads responsive to user searches. The data that Google has acquired from search and Google Chrome

17    users allowed Google to leverage its monopoly in the digital search market into the related but separate

18    market of display advertising.

19    79.    General online search services in the United States constitutes a distinct antitrust market.

20    Search services allow consumers to find responsive information on the internet by entering keyword

21    queries into search engines such as Google. These general search services are unique because they

22    offer consumers access to an extremely large and diverse volume of information from many sources

23    across the internet.

24    80.    There are no reasonable substitutes for general online search services. Other search

25    tools, platforms, and information sources are not reasonably interchangeable with general online search

26    services because they do not provide access to a wide range of information from one search inquiry.

27    Few consumers would find alternative sources a suitable substitute for general search services.

28
15

1    81.    Google has monopoly power in the United States general online search services market.
2  Google dominates this market with an approximately 90% market share. And nearly 95% of all search
3  queries on mobile devices are performed using Google's search engine.

4    82.    There are significant barriers to entering the market for general online search services,
5  including large capital investment, highly complex technology, access to effective distribution, and
6  adequate scale.

7    83.    Google's anticompetitive conduct has effectively eliminated rivals' ability to compete in
8  the general search services market. Google used exclusionary agreements, tying arrangements, and
9  payoffs to barricade its general search monopoly such that competitors are denied vital distribution,
10  scale, and product recognition—preventing them from realistically challenging Google in this market.
11  As one example, Google ensured that its search engine would be the preset default general search
12  engine on hugely popular devices like Apple's iPhone and the devices running on Google's Android
13  operating system.

14    84.    Online search advertising in the United States also constitutes a distinct antitrust market.
15  Search advertising enables advertisers to target their ads in real time in response to search queries.

16    85.    Other forms of advertising are not reasonably interchangeable with online search
17  advertising. The capability of search advertising to respond to consumers' inquiries at the moment they
18  are looking for information to make a potential purchase makes these ads highly valuable to advertisers
19  and distinguishes them from other types of advertising that cannot be targeted in this way, whether
20  online or offline. Display advertising is no substitute for search advertising, including because display
21  advertising is not responsive to a consumer's specific inquiry and is further removed from the point of
22  purchase. Few advertisers would find alternative sources a suitable substitute for search advertising.

23    86.    Google has monopoly power in the United States online search advertising market.
24  Google holds more than a 70% share of that market.

25    87.    Barriers to entry in the search advertising market, among other factors, protect Google's
26  monopoly in that market. Most critically, search advertising requires a search engine with sufficient

27

28                                          16

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1   scale to make the advertising profitable. Hence the same entry barriers that fortify Google's general

2   search services monopoly also protect Google's search advertising monopoly.

3       88.    Google's monopolies in search and search advertising—and the data they generate about

4   individual users—give Google an enormous advantage over online advertisers and publishers owing to

5   the sheer volume of information Google acquires about consumers through its integrated panoply of

6   products and services. This data include browsing histories from Google Search and Google's Chrome

7   web browser, and location data from Google Maps, Waze, and Google's Android operating system

8   embedded in hundreds of millions of smartphones. As Google's former CEO Eric Schmidt boasted,

9   "We know where you are. We know where you've been. We can more or less know what you've been

10   thinking about."

11       89.    Online advertising is more effective when it is targeted, displaying products or services

12   a user is more likely to want. Accordingly, user data—including gender, age, location, and browsing

13   history—influence not just the types of ads a user will see, but also the prices advertisers are willing to

14   pay. "The exact same ad, on the same website, at the same time, could be worth vastly different

15   amounts to two different buyers depending on how much they know about the consumer being

16   targeted," explained Ari Paparo, a former Google executive who founded the advertising company

17   Beeswax. "User data is everything."

18       90.    The prices that any company is able to fetch for ads that it displays online depend on

19   two crucial factors: the ability to identify *who* is loading the page or mobile application, and the ability

20   to connect that user's identity with more information about them.

21       91.    The targeting of display ads begins the moment a user clicks to visit a web page.

22   Typically, the user's IP address and location, along with the URL of the web page, are swiped from the

23   user's browser without their explicit knowledge. This data then informs the instantaneous ad auctions

24   that occur in the split second before the web page appears to the user. The goal is to build and deploy

25   as specific a portrait about the user as possible, primarily by linking their device with their identity.

26   Web cookies, tags, and "fingerprinting" of mobile devices are common tools for doing so.

27

28

17

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

Case 1:21-cv-06796-PKC   Document 24-1   Filed 05/14/21   Page 40 of 74
Case MDL No. 3010   Document 10-1   Filed 05/12/21   Page 40 of 74

Case 5:20-cv-03556-BLF   Document 52   Filed 12/04/20   Page 19 of 53

1    92.    If a publisher or company that sells online ads can know what a user is viewing
2    on *other* sites, the publisher can target the user based on that information when the user returns to the
3    publisher's site. Because of its dominance, including in search, Google can track users' visits to at least
4    70% of the top one million sites on the internet. Google has tags (including as a third party) tracking
5    user behavior on over 80% of popular websites.

6    93.    Due to Google's monopoly in search and its unrivalled ability to gather, aggregate, and
7    analyze user data, which it does not share, no potential competitor to Google can offer an advertising
8    product that comes close to the individualized targeting that Google can offer. Without access to search
9    data, potential rivals are effectively excluded from competing in digital advertising.

10   94.    To illustrate Google's vast advantage over any other publisher in accessing and
11   monetizing data, consider two hypothetical online publishers, CNBC and the *New York Times.*
12   Suppose, for example, that a user named Mary visits CNBC's website in the mornings, where she reads
13   about financial markets, and visits the *New York Times* in the evenings to read the book review section.
14   CNBC knows that Mary follows financial markets and might monetize her view at a $30 CPM (cost per
15   thousand impressions). The *Times* knows that Mary likes to read books and might only monetize her at
16   a $10 CPM. If the *Times* can somehow find out that Mary is reading CNBC in the mornings, then
17   when Mary visits the *Times* book review section in the evening, the *Times* can target her as someone
18   who follows the markets and monetize her at $30, too.

19   95.    Since the two are competitors in the supply side of the display advertising market,
20   CNBC would not want to share with the *Times* what Mary reads on cnbc.com. If CNBC is selling ads
21   to its audience of financial readers at a $30 CPM, and the *Times* can access CNBC's readers and their
22   reading patterns, then the *Times* could undercut CNBC and sell ads targeted to CNBC financial readers
23   for, say, $25 instead of $30.

24   96.    Google uses its ability to track users across the web to extract such a large advantage in
25   display advertising markets that rivals are effectively excluded. Google tracks users through its
26   analytics and ad-serving products, which it combined and rebranded as the Google Marketing Platform.
27   While publishers like CNBC and the *Times* would never share with each other user information that

28

18

1   gave each a competitive advantage, they have no choice but to share user tracking information with
2   Google, which acts as both their ad broker and supply-side competitor.

3        97.    Google's exclusive access to its proprietary data from Chrome and Android further
4   widens its substantial advantage over other publishers. Google relies on this data, which is generally
5   unavailable to competing bidders, when bidding on its own ad exchanges to win contracts to display
6   ads. Potential rivals for display advertising contracts cannot compete to win business without access to
7   this data.

8        98.    Furthermore, while digital ads trade on several auction markets, Google ensures that its
9   own display advertising inventory can only be purchased through its proprietary auctions. Thus, the
10   most effective, data-driven inventory stays within Google's control and potential competitors are
11   excluded.

12        99.    Having consolidated key portions of the ad tech stack for display advertising, Google
13   now readily brokers transactions on both sides of this market, and can steer advertisers to its *own*
14   display supply platforms like YouTube. As the U.K.'s CMA concluded in a report issued on July 1,
15   2020, "Google's strong position at each level of the intermediation value chain creates clear conflicts of
16   interest, as it has the ability and incentive to exploit its position on both sides of a transaction to favour
17   its own sources of supply and demand."

18        **2.**    **Google Harms Purchasers and Sellers of Online Advertising by Coercing**
19             **the Purchase of Display Advertising Through Tying Arrangements**

20      100.    With about nine out of ten internet searches using Google's search engine, Google is the
21   dominant source for search advertising. As a result, companies seeking to promote their products or
22   services online have little or no choice but to purchase search advertising space from Google. Google
23   has taken advantage of this dominance in the search advertising market to drive out competition in the
24   separate market for display advertising services, tying its display advertising services to its search
25   advertising services to extend its monopoly power.

26      101.    Because search advertising targets users who have already shown some interest in the
27   product or service from their search, few online advertising campaigns bypass online search as a

28

<div align="center">19

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF</div>

1  platform for marketing. Search advertising accounts for at least part of the ad spend of nearly every
2  advertiser engaged in online advertising.

3      102.    When a Google Ads account is established for use in placing search advertisements,
4  Google Ads is set as the default account for placing both search *and* display advertisements. Google
5  also blocks advertisers from using third-party DSPs to purchase Google Search inventory, which is sold
6  primarily through Google AdWords. And, to further disadvantage rivals, Google restricts access to
7  data relating to web searches performed on Google Search.

8      103.    When consumers run Google searches, Google collects and retains data related to the
9  searches. For example, Google Ads (a DSP) relies on algorithms that match keywords selected by
10  advertisers to user search terms to determine which search ads pop up after which searches.

11      104.    DSPs and advertisers use this data to craft more effective advertising campaigns.
12  Google, however, withholds this data from rival DSPs and advertisers using rival service providers. As
13  a result, an advertiser running both search and display ads cannot track the performance of its search
14  ads unless it relies only on Google to place its display ads.

15      105.    The effect of this policy is that, to access the search data over which Google has
16  monopoly control and which is vital to effective online advertising, an advertiser is coerced into using
17  Google's products in the separate market for display advertising services.

18      106.    Advertisers that open a Google Ads account are required to buy Google search
19  advertising. Thus, Google Ads does not merely steer advertisers to Google search advertising but
20  conditions their ability to bid for publisher display space upon their purchase and use of Google search
21  advertising.

22      107.    Google's restrictive practices coerce any advertiser whose marketing pairs online search
23  advertising with online display advertising to rely only on Google's intermediation services to place its
24  display advertisements.

25      108.    Exacerbating this tying conduct, Google pressures many advertisers to use only one
26  Google buy-side intermediary to purchase ad space. This pressure results from Google's decision to
27  scramble user IDs across multiple bidding tools instead of assigning and disclosing a single user ID to a
28

20

Case 1:21-cv-06796-PKC   Document 24-1   Filed 05/14/21   Page 43 of 74
Case MDL No. 3010   Document 10-1   Filed 05/12/21   Page 43 of 74

Case 5:20-cv-03556-BLF   Document 52   Filed 12/04/20   Page 22 of 53

1   particular advertiser. Because Google obscures DoubleClick IDs for all parties other than Google,
2   advertisers that use more than one buying tool at a time risk inadvertently bidding against themselves in
3   exchange transactions, driving up the price they would pay.

4       109.    Google's Ads Data Hub (ADH) allows advertisers to view data from ad campaigns,
5   including which users their search advertising campaigns reached, and to combine that data with
6   internal or third-party data to set or adjust display advertising strategy. Nevertheless, the ability to use
7   Google's ADH data comes with a built-in restriction: the data can only be sent to another Google
8   service and cannot otherwise be exported.

9       110.    In 2018, Google stopped allowing advertisers to access the encrypted user IDs from ad
10   campaign reports. Advertisers need this information to hire non-Google ad campaign measurement
11   firms. Advertisers that stay within Google's "walled garden" and use its ADH product can still access
12   these IDs.

13       111.    Google's restrictive policies have made it virtually impossible for an online marketer to
14   operate independently from the Google ad stack, particularly given Google's dominance in the DSP, ad
15   server, site analytics, and other submarket segments.

16       112.    Likewise, on the supply side, Google restricts publishers' ability to access the bid data
17   required to compare the performance of Google's exchange with rival exchanges. And Google does
18   not reveal to other market participants its own fees and commissions on transactions. As discussed
19   further below, this lack of transparency that Google has unilaterally imposed across the ad stack
20   undermines the ability of both advertisers and publishers to make the informed decisions necessary to
21   drive competition.

22       113.    Google similarly uses its dominance in the video-ad publishing market segment to
23   coerce advertisers to use Google's display advertising services.

24       114.    Google-owned YouTube is Google's most valuable display property. YouTube is by far
25   the most visited website in the United States, drawing more than three times the traffic of Twitter and
26   Facebook, respectively. Nearly every business that advertises with online videos buys advertising
27   space on YouTube, and about half of all video ads not appearing on Facebook and Amazon appear on

28

21

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1   YouTube.

2       115.   Video has become increasingly important to online advertising campaigns because of its
3   compelling nature and the exponential increase in user traffic that it generates. In 2019, 81% of
4   businesses used video as a marketing tool—up from 63% in 2018. By 2022, online videos will account
5   for more than 82% of all consumer internet traffic—15 times higher than the corresponding percentage
6   in 2017.

7       116.   After Google purchased YouTube, it initially made YouTube's inventory of display
8   advertising available to any advertising service provider. But in 2015, Google took YouTube off the
9   digital ad exchanges, restricting its ad inventory to being purchased *only through Google's* brokering
10  channels and bidding tools.

11      117.   Consequently, advertisers can no longer purchase YouTube inventory using a third-party
12  DSP. If an advertiser wants to purchase any of the valuable advertising space on YouTube, it must use
13  Google's advertising services and cannot use any of Google's rivals' advertising services.

14      118.   One erstwhile competitor described Google's requirement that Google services be used
15  to place ads on YouTube as "the beginning of the end," noting that "Google used its monopoly on
16  YouTube to put its hand on the scale" unfairly. Sen. Amy Klobuchar (D-MN) observed that this
17  change "of course had a crippling effect on Google's rivals" and "not only forces YouTube's ad
18  inventory into Google DSP, it also had the effect of driving non-YouTube ad volume to Google and
19  away from the rival DSPs."

20      119.   In 2018, Google also began restricting third-party ad servers from tracking viewing
21  activity on YouTube, leaving Google-owned Display & Video 360 as the only product available to
22  collect and analyze YouTube advertising data. This action effectively tied YouTube to Google Ads and
23  Display & Video 360, preventing advertisers from using competitors' products to serve *or* analyze ads
24  on YouTube.

25      120.   Google's leveraging of its position in forums like YouTube in which it is the dominant
26  ad publisher restrains competition with an enhanced effect because advertisers almost always use a
27  single DSP for a given advertising campaign. Advertisers use a single DSP for a campaign largely

28

22

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1    because doing so allows them to manage frequency caps (limits on the number of times the same user is
2    shown an ad) during the campaign and facilitates audience management and reporting. Thus, if an
3    advertiser wished to advertise on YouTube, Google Search, *and* other publisher websites, the advertiser
4    would bear significant costs and inefficiencies from using a different advertising service provider to
5    broker distribution of the ad campaign into each forum.

6        121.    Even if an advertiser preferred to use multiple DSPs, Google does not permit it to use
7    third-party DSPs to purchase Google Search inventory (sold primarily through Google AdWords) or
8    Google's YouTube inventory. Because Google Search and YouTube, in addition to digital display, are
9    essential to many online ad campaigns, Google is able to capitalize on its "must-have" inventory to
10   tether advertisers to its DSP. And because advertisers typically use one DSP per ad campaign, a
11   display advertiser that wants any of its ads to appear on Google Search or YouTube must use Google's
12   DSP for the entire ad campaign. In short, Google enlisted its dominance in search and search
13   advertising to pursue and secure a monopoly in display advertising.

14       122.    Google has also combined ad tech stack products that were once technically separate but
15   interdependent, reinforcing that they were effectively tied within the relevant market all along. For
16   instance, using Google's ad server, formerly called DoubleClick for Publishers, was for many years the
17   only way to obtain full access to Google's AdX exchange. That access was critical for publishers
18   because AdX connected to AdWords, and the ability to access AdWords greatly expanded publishers'
19   access to advertisers because of Google's dominance in search. As the *Wall Street Journal* reported,
20   "[f]or many years, Google's AdX was the only ad exchange that had access to" Google's AdWords
21   platform and its many advertisers. Thus, for example, when News Corp considered switching from
22   Google to a different company to facilitate its ad-serving business, it reportedly "felt it would
23   jeopardize the 40% to 60% of advertising demand it gets from Google's ad marketplaces . . . ."
24   According to the *Journal*, Google in 2018 merged DoubleClick for Publishers and AdX "into a single
25   product called Google Ad Manager, making it plain to the industry that they are indeed linked . . . ."

26       123.    Advertisers have suffered harm by paying higher prices due to Google's display
27   advertising monopoly. During the class period, increases in the prices paid by advertisers to place

28                                                    23

1   online display ads have outpaced the rate of inflation as a result of Google's ability to charge supra-
2   competitive prices free from any realistic competitive threat.

3   124.   The investigation conducted by the House Subcommittee on Antitrust, Commercial, and
4   Administrative Law revealed that many companies pay Google most of their online ad expenditures.
5   For example, one major company paid well over half of its total ad spend to Google each year from
6   2016 to 2019, with the second top provider receiving less than 15%.

7   125.   A 2018 study by eMarketer, which focused on programmatically purchased ads across
8   the open internet, found that programmatic ad prices have risen meaningfully across all major display
9   categories: desktop, mobile, mobile app, and video. In 2018, the average digital advertisement sold for
10   12% more than it did in 2016, an increase approximately five times the prevailing rate of inflation.
11   These price increases resulted in substantial part from Google's consolidation of the intermediation
12   services market and Google's price increases for those services, and were largely borne by advertisers
13   who paid Google for those services to broker the placement of their display ads.

14   126.   *Bloomberg* also reported that as of 2019, Google had increased the price of search ads
15   by about 5% annually, a rate more than three times greater than the 1.6% inflation rate during the same
16   time period.

17   127.   Google's power in the relevant market enabled it to raise the prices of its brokering
18   services to supra-competitive levels. The higher prices have increased Google's profits, but advertisers
19   now receive less for each dollar they spend, with trading costs now accounting for half the cost of every
20   trade on average.

21   128.   A substantial portion of Google's trading fees are monopoly rents. Competitive market
22   conditions would serve to reduce these fees.

23   129.   Advertisers have seen progressively lower returns on their digital advertising
24   investments as Google built and reinforced its monopoly in the relevant market. And publishers have
25   lost ad revenue because Google's entrenched monopoly has enabled it to take a comparatively larger
26   cut of advertisers' payments for the placement of ads.

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

130. The higher prices have greatly benefited Google. Google has consistently reaped profits at margins greater than 20%—almost three times more than the average profit margin for an American business. Financial analysts predict that Google is well positioned to maintain its dominance in digital advertising, noting that "Alphabet has established unusually deep competitive moats around its business."

131. Google's reserve-price practices also have caused advertisers to pay higher prices. In its online ad auctions, Google sets a reserve or floor price, which corresponds to a minimum bid that is needed to win a particular ad placement. If none of the bids exceeds this reserve price, the winning bidder *must* pay the reserve price—a price that, by definition, is higher than the price that would have won the placement in an auction in which Google had not set a floor price. In fact, the majority of winning bids by advertisers are at the reserve price. The lack of competition from other ad auctions has allowed Google to impose these supra-competitive floor prices. At the same time, Google denies advertisers access to data they would need to accurately measure the success of their advertising campaigns and negotiate for lower prices.

132. Market participants such as advertisers and newspapers also lack visibility into the fees charged along the supply chain, which limits their ability to make optimal choices about how to buy or to sell advertising inventory. A market participant observed in congressional testimony that "Google could make the process 'more transparent,' but given Google's financial stake in maintaining secrecy, 'there is no incentive to do so.'"

133. The foreclosure of competition in digital advertising markets resulting from Google's monopoly has harmed the public at large. When advertisers pay supra-competitive fees to brokers like Google for placing ads, they pass on a portion of those costs to their customers by marking up the prices of their goods and services. And when publishers receive anticompetitive underpayments for running ads, they are often forced to cut costs, including through layoffs, and hence cannot produce content of the same quality or variety. Finally, by eliminating competition, Google's display advertising monopoly also has reduced the incentive to innovate in these markets and thereby deprived the public of the benefit of improvements in advertising services and delivery.

25

### D.   Google Created and Has Maintained Its Monopoly in Display Advertising Services by Restricting the Ability of Rivals to Compete on Equal Footing

134.   Google has engaged in a host of anticompetitive practices, including the leveraging of its monopoly in search and search advertising and the multiple tying arrangements discussed above, to disadvantage its rivals and cement its dominance in the display advertising services market.

135.   Another key monopolistic practice that Google employs is denying interoperability—that is, Google denies the ability of its own advertising service systems to interface with the systems of rival advertising service providers, where those systems once were compatible.

136.   Google's set of anticompetitive acts described in this complaint, including its monopoly leveraging, tying, exploitation of user data, and foreclosure of technological compatibility, were part of a unified, long-term strategy to exclude competition in the relevant market. While each component of that strategy, by itself, may not have sufficed to allow Google to monopolize the relevant market, their combined effect was to roll back competition, giving Google untrammeled power across the ad tech stack connecting advertisers and publishers of display advertising.

137.   Although Google has publicly claimed that publishers can "mix and match technology partners," that claim is false in several important respects. Google changed its practices to deny interoperability with its rivals to squelch competition that would otherwise occur within Google's SSP system. When accepting bids from advertising services, Google's SSP operates more efficiently with Google's own advertising service. Although Google's SSP can accept bids from non-Google advertising services, Google's SSP is inefficient by design at processing those bids, and they are therefore disadvantaged as compared to bids submitted by Google's own advertising service. As the U.K.'s CMA explained in its July 1, 2020 report, if a publisher "uses a non-Google ad server, AdX would not participate in a real-time auction with other SSPs, but would compete with an 'expected' price, which determines the order in which SSPs are sent an ad request" and "is inefficient for the publisher."

138.   Google, in short, runs an auction that includes its own bids, which are prioritized by the auction system that Google designed in such a way that non-Google-based bids cannot effectively compete. Imagine if this were a live, in-person auction: Google would be the auctioneer as well as a

26

1  bidder; and it would have designed the process so that the other bidders could not hear the live bids, but
2  instead would need to submit in advance bids based on guesses about what the other bids were going to
3  be. Exacerbating these conflicts, Google is also a seller of a portion of the inventory up for bid.

4        139.   Google also imposed new restrictions on publishers' ability to set differential price
5  floors, preventing them from calibrating different pricing for different SSPs or DSPs. This change had
6  its intended result of driving more brokering business to Google on the sell side because publishers
7  could no longer set higher floor prices for Google than for other sources of demand.

8        140.   Moreover, Google's asymmetric approach to sharing websites' DoubleClick user IDs
9  has distorted competition among buying tools seeking to purchase ad space from Google's exchange—
10  *i.e.*, the limited number of buying tools that still compete with Display & Video 360 and Google Ads.
11  Google's exchange shares users' DoubleClick IDs with Google-owned buying tools. But, when
12  sending bid requests to *non*-Google intermediaries, Google's exchange shares a different ID value that
13  is obscured from view.

14        141.   Google's scrambling of IDs in this manner has directly interfered with competition. An
15  advertiser that uses Google's DoubleClick ad server now has a much harder time using a non-Google
16  buying tool because the two tools operate on different user IDs.

17        142.   Still another example of Google's exclusionary conduct involves technology called
18  header bidding, a system designed by Google's competitors on the sell side to compete with Google's
19  display advertising exchange. Google responded to header bidding not by accepting the free and open
20  competition it otherwise would have fostered, but by preventing its systems from working with the
21  javascript code that publishers usually placed on their websites to enable header bidding. The result of
22  this lack of compatibility was that the publisher would first notify non-Google exchanges and the
23  winning bid would be sent to Google as if it were a pre-existing contract price. Thus, instead of
24  submitting a blind bid to the publisher for how much the publisher would be paid to place an ad on its
25  website, Google would separately receive the bids submitted by *other* service providers and then
26  submit its *own* bid, knowing the minimum price it would need to outbid its rivals. This rigging gave
27  Google a significant advantage over its rival brokers because, unlike Google, they would need to

28

1   submit aggressive bids to ensure their bid was the most attractive—and even then Google could outbid
2   them to win display advertising business.

3      143.   Google's rivals lacked Google's market dominance and therefore could not make their
4   systems incompatible with header bidding as Google did. Had they done so, a publisher simply would
5   not have received bids from them. Even after Google permitted non-Google service providers to
6   integrate with Google's "Open Bidding" system—its exclusionary response to header bidding—
7   Google charged the winning bidder 5-10% of the winning bid, driving up the costs to Google's rivals of
8   merely attempting to compete with Google. This structure also gives Google a systematic advantage in
9   bidding to place ads because it does not charge itself these fees.

10      144.   Similarly, when Google launched its Accelerated Mobile Pages, or "AMP," it made the
11   pages incompatible with header bidding, coercing publishers to use Google's Open Bidding system.
12   And to further repel competition created by header bidding, Google began conditioning premium
13   treatment on Google Search (*i.e.*, being featured at the top of search results) upon publishers migrating
14   to AMP and forgoing the use of header bidding.

15      145.   As Mr. Heimlich, the digital marketing expert, described in his Senate testimony,
16   "Google became the only display company not hobbled by the exclusions and restrictions it'd placed on
17   everyone else. The power to interoperate among buy-side, sell-side and measurement software went
18   from being a feature of the exchange ecosystem to a capability exclusive to Google." That exclusive
19   capability fortified Google's power to exclude rivals and allowed it to further boost its share of the
20   display advertising services market, unfettered by any meaningful competition.

21      **E.**    **Google Maintains Its Display Advertising Monopoly with Harmful Anticompetitive**
22           **Conduct**

23      146.   Google maintains a culture of secrecy around its advertising services, a culture made
24   possible by its market power. When acting as an intermediary, Google conceals from publishers and
25   advertisers the price actually paid to Google for an ad placement. Even so, the consensus among
26   knowledgeable publishers and advertisers is that Google's "ad tech tax" is high, particularly in
27   comparison to fees charged in non-programmatic ad markets.

28

1      147.    Google is competing with other sellers of display advertising, yet because it is also

2  acting as the broker for these sales, Google has unique information which it denies to the buyers and

3  other sellers to protect its monopoly. Google refuses to disclose even basic information, including the

4  fees it charges for each transaction, to other participants in the ad tech stack, causing market-distorting

5  inefficiencies that solidify its grip on display advertising.

6      148.    Google redacts its take rate from trading or auction records on both the buy-side and the

7  sell-side. Service providers in competitive markets, by contrast, generally must furnish their customers

8  detailed accounts of the services they are providing to justify the prices they charge. Studies have

9  shown that about 15% of display advertising transaction costs are unaccounted for: these are Google's

10  monopoly rents.

11      149.    In surveys conducted by Association of National Advertisers estimating take rates,

12  participants reported it was impossible or very difficult to obtain transaction-level pricing data related

13  to Google's brokering services. This lack of transparency makes it harder for publishers to negotiate

14  with advertisers, and for potential competitors to compete with Google.

15      150.    Google also removes time-stamp information on bids, which publishers previously had

16  used to optimize their pricing. Moreover, Google conceals information about the performance of the

17  digital ads it brokers, such as how many impressions are shown to actual users, as opposed to bots.

18  Google's multiple failures of transparency reinforce its power in the display-ad market and prevent

19  advertisers from knowing if they are wasting some of their spend.

20      151.    Google's lack of transparency is strong evidence of its monopoly power. If Google

21  were subjected to competition in the relevant market, it could not conceal from advertisers and

22  publishers information that Google collects related to their transactions for the placement of display

23  ads. In a competitive market, Google would risk losing business to more transparent rivals, as both

24  advertisers and publishers have an interest in learning, assessing, and modulating their advertising

25  efforts in response to information related to those transactions.

26      152.    Google's lack of transparency is not limited to withholding of information. When

27  advertisers use the Google Ads tool to bid on ad space belonging to third-party publishers from

28

1    Google's exchange, Google does not disclose to them the price at which the ad space actually cleared.

2    Google can thus arbitrage advertisers' bids across two Google-controlled marketplaces—a fact that

3    may go unnoticed by small-business and other advertisers due to the sheer complexity of Google's

4    terms, including in its various "Help" documents. Read as a whole, the terms appear to permit Google

5    to process bids that advertisers submit via Google's buying tool for smaller advertisers (known as

6    Google Ads) through two different Google marketplaces (auctions). In other words, Google Ads hosts

7    a first auction, and then Google Ads acts as the "buyer" in Google's exchange, so that Google

8    simultaneously acts on the buy-side and the sell-side. Google implicitly confirmed this practice to

9    Australia's competition authority.

10      153.    Google has claimed implausibly that the conflicts of interest now present in its digital

11    advertising business should lead to market efficiencies rather than distortions, asserting that "the

12    combination of Google's search business and its vertical ad tech integration should give it incentives to

13    balance the interests of all ecosystem participants." But market data tell a different story. Google's

14    public filings show that the differential in allocation of advertising revenues between Google and non-

15    Google properties has consistently increased. In 2007, the share going to Google properties increased

16    to 64%, in 2008 to 68%, eventually to 71% (2011), then 75% (2014), 77% (2015), 80% (2016), 81%

17    (2017), and 82% (2018). This percentage increased again in 2019, with just 16% of the $134 billion

18    that advertisers spent through Google going to the more than 2 million *non*-Google properties that sell

19    their ad space through Google's exchange and buying tools. These widening percentages well

20    demonstrate the market distortions now favoring Google, and they correspond to—and resulted from—

21    Google's steady acquisition of monopoly power in the ad tech stack.

22      154.    As discussed above, Google has ready access to enormous amounts of consumer data,

23    yet it has also acted to prevent competitors from obtaining similar information. In January 2020, for

24    instance, Google announced that it would "phase out" the third-party cookies in its Chrome browser

25    that help advertisers target consumers based on demographics, past browsing history, and other

26    information. As a result, competing exchanges and buying tools soon will no longer be able to use

27    cookies to assign user IDs for the purpose of buying and selling ads. Without access to third-party

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1    cookies, it will be much harder for advertisers and competing service providers to bid rationally on ads.

2    Yet that is not so for Google, which will continue to have other sources for gleaning robust data on

3    consumers. Google Chrome has begun tracking users' web activity directly at the browser level,

4    obviating Google's need to rely on cookies for identity information.

5        155.    In 2016, Google launched AMP for the stated purpose of loading web pages faster on

6    mobile devices. AMP is a framework that websites can use to create fast-loading mobile web pages.

7    By limiting the types of programming codes that can be used on a page, AMP pages load faster than

8    they otherwise would. When a user clicks on an AMP link from Google Search, instead of being

9    routed to the page on the third-party site's server, the user sees a cached version stored on Google's

10   own servers via its Content Delivery Network.

11       156.    Google encourages publishers to use AMP web pages and lists them first in a search.

12   But, because the pages are *Google* pages, publishers are unable to gather data about their own users as

13   they normally would. For example, in the below image, the left side shows a *Newsweek* article on its

14   own server. The right side shows the same article, but on a Google-hosted page the user would see

15   after clicking on the AMP-loaded link via Google Search:

16



Left: Normal article; Right: AMP article loaded from Google Search

28                                               31

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

157. Google's strategy to host more and more content on its own servers demonstrates that Google views content providers themselves as long-term competitors for the capture of ad dollars. More than half of the desktop searches on Google keep users on Google properties rather than prompting clicks to the rest of the web. For mobile searches, 70% of Google searches keep users on Google properties. The percent of Google's revenue from advertising dollars spent on its own properties increased from 64% in 2007 to 85% in 2020.

158. The report issued on October 6, 2020 by the House Subcommittee on Antitrust, Commercial, and Administrative Law notes that, "in the context of Google's placement of news on accelerated mobile pages (AMP) . . . publishers raised concerns that 'Google effectively gave news publishers little choice but to adopt it,' requiring the creation of parallel websites 'that are hosted, stored and served from Google's servers rather than their own.'"

159. A recent study by the News Media Alliance found that in 2018, Google gained over $4 billion in revenue from crawling and scraping news content, and running associated display ads, without paying the publishers for that use. Google was able to take these steps because of its monopoly power over display advertising.

160. Considered as a whole, Google's activity in the ad tech stack reflects a long-term strategy to monopolize display advertising. Through acquiring rivals, leveraging its monopoly in search, tying display advertising to search advertising, denying the interoperability of its products with others, exploiting conflicts of interest, and withholding information from other market participants, Google has effectively created a "walled garden" for display advertising. Google sells its own display advertising inventory even as it brokers a large majority of all display advertising sales, inhibits potential rivals from competing by denying them information and equal footing in the intermediation process it controls, and has acquired any company that threatens its display advertising services monopoly. Google profits illegally from its walled garden by plucking the fruit every step of the way.

F. **Government Investigations and Actions Regarding Google's Monopolistic Activities**

161. In July 2019, the United States Department of Justice announced that it had opened an

32

1   investigation into whether Google is committing illegal monopolistic acts. The DOJ stated that its
2   probe would focus on whether and how Google and other leading online platforms "have achieved
3   market power and are engaging in practices that have reduced competition, stifled innovation, or
4   otherwise harmed consumers."

5       162.    DOJ's ensuing civil action—joined by eleven state attorneys general and filed on
6   October 20, 2020 in the United States District Court for the District of Columbia—focuses on Google's
7   monopoly conduct in the markets for online search, search advertising, and search text advertising. The
8   complaint of these governmental enforcers alleges that Google acted unlawfully to preserve these
9   monopolies after having "created continuous and self-reinforcing monopolies in multiple markets."

10      163.    As a result of Google's monopoly conduct, the enforcers allege, consumers are "forced
11   to accept Google's policies, privacy practices, and use of personal data; and new companies with
12   innovative business models cannot emerge from Google's long shadow."

13      164.    The governmental enforcers further note that Google's conduct and internal messaging
14   demonstrate its executives' awareness that Google has used its monopoly power to restrain
15   competition: "Google employees were instructed to avoid using terms such as 'bundle,' 'tie,' 'crush,'
16   'kill,' 'hurt,' or 'block' competition, and to avoid observing that Google has 'market power' in any
17   market."

18      165.    The governmental enforcers seek, among other relief, "structural relief as needed to cure
19   any anticompetitive harm" and an injunction forbidding Google's anticompetitive practices: "Absent a
20   court order, Google will continue executing its anticompetitive strategy, crippling the competitive
21   process, reducing consumer choice, and stifling innovation."

22      166.    The attorneys general of every state except Alabama are separately investigating
23   Google for monopolization. In September 2019, the attorneys general of 48 states, and of the District
24   of Columbia and Puerto Rico, led by Texas Attorney General Ken Paxton, disclosed that they had
25   opened an investigation into whether Google is violating the antitrust laws. In announcing the
26   investigation, Mr. Paxton referred to "evidence that Google's business practices may have undermined
27   consumer choice, stifled innovation, violated users' privacy, and put Google in control of the flow and

28

33

1    dissemination of online information."

2        167.    On May 15, 2020, the *Wall Street Journal* reported—based on information from
3    "people familiar with the matter"—that "[m]uch of the states' investigation has focused on Google's
4    online advertising business. The company owns the dominant tool at every link in the complex chain
5    between online publishers and advertisers."

6        168.    The Texas Attorney General served Google with extensive civil investigative demands
7    for documents and information on September 9, 2019 and on June 22, 2020. These demands focus
8    almost exclusively on Google's business decisions and conduct in the market for display advertising
9    services, *i.e.*, the ad tech stack.

10       169.    On July 9, 2020, news media reported that the California Attorney General's Office had
11   opened its own independent antitrust investigation of Google.

12       170.    On July 29, 2020, the House Subcommittee on Antitrust, Commercial, and
13   Administrative Law of the House Judiciary Committee held hearings on the subject of "Online
14   Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google."
15   Google CEO Sundar Pichai appeared for questioning by members of Congress, including regarding
16   whether Google has abused its position as the default web gateway with its dominant search engine.
17   The Subcommittee Chair, Rep. David N. Cicilline (D-RI), noted the "harmful economic effects" of the
18   market dominance of Google and the other companies under scrutiny for monopoly conduct: "They
19   discourage entrepreneurship, destroy jobs, hike costs, and degrade quality."

20       171.    On October 6, 2020, the House Subcommittee issued a report entitled "Investigation of
21   Competition in Digital Markets." The report finds that, "[w]ith a sizeable share in the ad exchange
22   market, ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on
23   behalf of publishers and advertisers, while also trading for itself—a set of conflicting interests that
24   market participants say enable Google to favor itself and create significant information asymmetries
25   from which Google benefits."

26       172.    The House report recognizes that Google's series of acquisitions in the relevant market
27   "enabled it to gain a controlling position across an entire supply chain or ecosystem. Google's

28

34

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1   acquisitions of DoubleClick, AdMeld, and AdMob . . . let Google achieve a commanding position

2   across the digital ad tech market."

3        173.   On September 15, 2020, the Subcommittee on Antitrust, Competition Policy, and

4   Consumer Rights of the Senate Judiciary Committee held a hearing on the subject of "Stacking the

5   Tech: Has Google Harmed Competition in Online Advertising?" Questioning Google's witness, Sen.

6   Josh Hawley (R-MO) took note of its "enormous advantage in this ad stack that you control every

7   single layer of." Google controls "the entire ad stack from top to bottom," he further explained.

> And you're using your position in search and YouTube in order to give
> yourselves a dominant position in the ad stack, and not just on the demand
> side . . . but also on the supply side. . . . I think the concern is, is that you
> control YouTube and search, which are the dominant platforms; you control
> massive amounts of consumer data that you have harvested from your other
> consumer-facing platforms—Gmail, Google Maps, G-Suite, etcetera. You
> then use those advantages in the ad stack at every single layer, every layer of
> which you exercise dominance in.

Senator Hawley concluded: "This looks like monopoly upon monopoly, in a classic case of tying."

        174.   Senator Klobuchar added that "Google may be taking between 30 and 70 percent of

every advertising dollar spent by advertisers using its services, depriving publishers of that revenue."

She also stated that, "[w]ith the benefit of hindsight, it seems obvious that [Google's] acquisitions

were undertaken by the company in order to add to its market share and without explanation . . . other

than for Google to establish and maintain the monopoly power it currently has."

        175.   Sen. Richard Blumenthal (D-CT) stated that Google has committed "quite simply a

stunning abuse of market power." Senator Blumenthal termed Google's position in regard to its

digital advertising monopoly "indefensible," noting that

> in no other market does the same party represent the seller, the buyer, make
> the rules and conduct the auction. . . . Given that Google operates the
> exchange and it competes with publishers on that exchange, that is a classic
> risk of insider trading. If you compare it as Google has to the stock market,
> Google would have been prosecuted long ago for insider trading.

        176.   Google has already met with significant regulatory action in Europe. The European

Commission fined Google $2.7 billion in 2017 for rigging search results to favor its own online

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1  shopping portal and $1.7 billion in 2019 for dictating to other websites how they can display search
2  results from Google's competitors.

3      177.   In December 2019, France's competition authority fined Google $166 million
4  following a lengthy investigation into Google's online advertising practices. France sanctioned
5  Google for adopting "opaque and difficult to understand" rules for its ad platform and for applying
6  them in an "unfair and random manner." According to *TechCrunch*, the French governing body also
7  found that "another element of Google ad rules could lead sites to favor a content policy aligned with
8  its own ad-funded services—thereby pushing online publishers to adopt an economic model that deeds
9  and benefits its own." The French governing body summarized its bases for fining Google as follows:

10     [T]he French Competition Authority considers that the Google Ads operating
11     rules imposed by Google on advertisers are established and applied under
    non-objective, non-transparent and discriminatory conditions. The opacity
12     and lack of objectivity of these rules make it very difficult for advertisers to
13     apply them, while Google has all the discretion to modify its interpretation of
    the rules in a way that is difficult to predict, and decide accordingly whether
14     the sites comply with them or not. This allows Google to apply them in a
    discriminatory or inconsistent manner. This leads to damage both for
15     advertisers and for search engine users.

16     178.   On July 1, 2020, the U.K.'s Competition and Markets Authority released a 437-page
17 report entitled "Online Platforms and Digital Advertising: Market Study Final Report." The CMA
18 found that Google has dominant market share positions at each level within the ad tech ecosystem,
19 with particularly high shares of at least 80% in both the publisher ad server and advertising markets.
20 The CMA further found that Google "has been able to leverage the market power from its owned-and-
21 operated advertising inventory into the open display market and within the ad tech stack, making it
22 harder for third-party intermediaries to compete," and that "greater competition and transparency
23 would put downward pressure on" fees borne by advertisers and publishers. Additionally, the CMA
24 found that Google has deployed its dominant market positions by engaging in "self-preferencing
25 behaviour," such as precluding publishers using Google Ad Manager from setting different floor
26 prices for different buyers, a policy shift that substantially increased "Google demand's win rate."
27     179.   In response to Google's attempts to justify its lack of transparency and other practices
28

36

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1   by invoking data privacy laws, the CMA observed that "Google itself" has proposed technologies "to
2   allow targeted advertising without user profiling," and that Google has an obvious incentive to
3   interpret data protection laws in a self-serving way to "entrench[] its own competitive advantage,
4   including by denying third parties access to data that is necessary for targeting, attribution, verification
5   and fee or price assessment" while preserving its own right to use that data within its "walled garden."

6   **V.      INTERSTATE TRADE AND COMMERCE**

7        180.    Google's conduct as alleged herein has had a substantial effect on interstate and
8   intrastate commerce.

9        181.    At all material times, Google participated in the marketing, promotion, distribution, and
10  sale of publication and advertising services for display advertisements in a continuous and
11  uninterrupted flow of commerce across state and national lines and throughout the United States.

12       182.    Google's conduct also had substantial intrastate effects in that, among other things,
13  Google's publication and advertising services for display advertisements were sold in each state,
14  including California. At least thousands of individuals in each state, including California, were
15  impacted by Google's anticompetitive conduct. As alleged below, absent Google's unlawful conduct,
16  Plaintiffs and class members within each state would have paid less or received more money for
17  digital advertising services.

18  **VI.     RELEVANT MARKET**

19       183.    Google's anticompetitive conduct has restrained competition in the market for online
20  display advertising services, encompassing the overall system or process that connects online display
21  advertisers and publishers (including Google). This market, colloquially known as the "ad tech stack"
22  or "ad stack," comprises various segments and is the relevant market that Google monopolized for
23  purposes of this action.

24       184.    The relevant geographic market is the United States. Market participants recognize this
25  in the ordinary course of business. For example, Google offers display advertisers the ability to target
26  and deliver ads based on the location of publishers or consumers in the United States. Google also
27  separately tracks display advertising revenue for the United States.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1    185.    Google is the dominant provider of online search and search advertising in the United
2    States—over 90% of internet searches are performed on Google's search engine—and used its
3    dominant position in those markets to restrain trade in the separate market for display advertising
4    services.

5    186.    The display advertising services market comprises advertising services and platforms,
6    and publishing services and platforms. Google has monopolized each of the relevant submarkets of
7    the overall market for display advertising services, including the subsidiary markets for publisher ad
8    servers, supply-side platforms, demand-side platforms, and advertiser ad servers. Google's conduct
9    had the intent and effect of suppressing competition in the display advertising services market as well
10   as in each of its component submarkets, and converting those submarkets into a single intermediation
11   market under its control.

12   187.    Google controls well over 90% of the PAS submarket and more than half of the SSP
13   and associated ad exchange submarket. Likewise, on the demand side, Google controls 80-90% of the
14   AAS submarket and at least 60% of the DSP submarket.

15   188.    Google has wielded its market power to integrate each submarket of the ad stack into a
16   single set of bundled services, with the intent and effect of preventing and discouraging competitors
17   (other display advertising services providers), publishers, and advertisers from relying on advertising
18   service providers on a product-by-product basis. Google's anticompetitive conduct has foreclosed
19   competition, eliminating the ability of each segment of the display advertising services process, and
20   the process as a whole, to function as a free and independent market. As a result of Google's conduct
21   detailed in this complaint, Google has succeeded in combining the various subcomponents of the
22   intermediation market for display advertising into one market—and a large and continually increasing
23   majority of advertisers and publishers recognize and submit to this economic reality by paying only
24   Google for display advertising brokering services.

25   189.    Digital display advertising on the open web is a "market" under antitrust law even
26   though advertisers may engage in other forms of digital advertising as well. Online display
27   advertising is at base a matching problem. On one side are publishers who produce content, and earn

28
                                                        38

1  revenue by displaying ads to users. On the other side are advertisers who are interested in displaying
2  ads to particular users (*e.g.*, based on demographics or market segments). The online user population
3  is fragmented across hundreds of thousands of publishers, preventing advertisers from reaching
4  desired customers without assistance from an intermediary. Likewise, given the vast number of
5  advertisers interested in displaying their ads, most publishers would find it very difficult to maintain
6  the corresponding business relationships.

7      190.    Display advertising brokering services have no reasonable substitute for purposes of
8  marketing goods or services in today's economy. While it is theoretically possible for an advertiser to
9  connect directly with a publisher to negotiate the placement of advertisements onto the publisher's
10  supply of advertising space, for the vast majority of advertisers doing so is impractical and very rare.
11  At least 90% of all online display advertising space in the United States is bought and sold on ad
12  exchanges in the electronic real-time bidding market.

13      191.    Nearly all advertisers lack the resources and access to be able to negotiate directly with
14  particular publishers to place their display advertisements, and even advertisers with the ability to do
15  so prefer not to limit their placement of display advertisements to discrete websites. Publishers and
16  advertisers thus generally rely on third-party display advertising services to facilitate the placement of
17  online display advertisements.

18      192.    In the rare instances where select advertisers can purchase "directly from the publisher"
19  they can do so via manual media buying, programmatic direct buying, or a private, invite-only
20  marketplace (PMP). Manual media buying is antiquated and now seldomly if ever done.
21  Programmatic direct and private auctions are the only current ways to purchase advertising directly
22  from publishers. Programmatic direct buying is done under extremely limited circumstances of either
23  specific invite from the publisher to participate in a private auction, or directly, without an auction, at
24  ultra-premium prices most advertisers cannot afford. Ads sold through programmatic direct are
25  typically tied to premium publishers (*e.g.*, *Forbes*) that reserve a limited percentage of their inventory
26  for which they can demand a premium price from well-capitalized advertisers, which receive
27  guaranteed ad space in return. Similarly with PMP, the participants are large enterprise advertisers and

28

1    marketers, and only a handful of large advertisers (*e.g.*, Nike, Barclays) are invited to bid on a
2    publisher's inventory. PMP is typically offered by publishers with premium, expensive inventory, such
3    as major media sites like *Forbes*, the *Wall Street Journal*, or the *New York Times*.

4        193.    For small- and medium-sized advertisers, it is essentially impossible to access such
5    exclusive inventory directly—not only are they not invited by the publisher, but even if they were, they
6    could not pay the high prices set by the publisher. Together, private invite-only auctions and direct
7    purchase are so exclusive that they account for a very low percentage of the display advertising market,
8    and they are no substitute for real-time bidding on the open web.

9        194.    In fact, Google often is involved in these limited invite-only and premium ad-buying
10   processes where they occur. Google offers these options for transacting in Display & Video 360
11   (reserved for enterprise advertising customers), and DoubleClick Ad Exchange offers services to
12   facilitate invite-only exchanges. As such, despite these processes' "private" label, Google's
13   participation is frequently still required to complete the underlying transactions.

14       195.    Online display advertising is not substitutable with traditional forms of advertising,
15   such a print, television, radio, or billboard advertisements. None of those platforms rely on individual
16   targeting based on individual user data and profiles—the entire driver of programmatic or automated
17   display advertising. Recent pricing and bid data from various exchanges illustrate the point. For
18   example, a 2018 Google study reported that the prices for ad space trading on Google's exchange drop
19   by half or more when advertisers cannot identify users associated with the ad space for sale.
20   Relatedly, according to Index Exchange, the number of bids for ad space on Mozilla Firefox pages
21   declined by 38% after that internet browser started blocking cookies. In short, unless they can know
22   the identity of the users being targeted, advertisers often avoid ad auctions altogether.

23       196.    Regardless of whether certain traditional forms of advertising may be reasonably
24   interchangeable for each other, digital advertising is not. Digital advertising is different in kind from
25   traditional forms of advertising, including because it reaches targeted customers individually and
26   because digital advertisements can be continuously updated and improved based on data showing how
27   consumers are responding.

28

40

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1  197. With the broad category of digital advertising, display advertising is not reasonably
2 interchangeable with search advertising. These two forms of digital advertising perform different
3 roles, serve different purposes in marketing campaigns, and are treated by advertisers and marketing
4 firms as distinct. Search is intent-based advertising that seeks to induce consumers who have already
5 shown an interest in buying a product or service to make a purchase. Display, in contrast, is suitable
6 for raising awareness about a product, service, or brand and reaching new audiences that may not yet
7 have shown an interest. Because of this basic difference in how the two forms of advertising function
8 in relation to potential customers, they are not reasonable substitutes for each other.

9  198. During the class period, display advertising also performed a unique function in
10 advertisers' re-marketing campaigns. When a user visited a website selling goods or services, or
11 clicked on a certain online advertisement, a "cookie" (or small file) capturing that user's action would
12 be stored on their browser. Then, as the user continued to browse the web, the cookie enabled the
13 placement of display advertisements on other websites from the company whose website the user had
14 visited or on whose advertisement the user had clicked. Numerous class members, including Plaintiffs
15 Prana Pets and Hanson Law Firm, relied on display advertising brokered by Google to carry out such
16 re-marketing aiming to increase user "conversion" into paying clients or customers. These campaigns
17 also resulted in the placement of display advertisements to users who carried a similar "cookie" profile
18 as users who visited the advertiser's website and/or clicked on its advertisement. Search advertising
19 cannot accomplish this re-marketing given that the purpose of this strategy is to target a discrete set of
20 users with display advertising.

21  199. The government enforcers note in their complaint that display advertising, in contrast to
22 search advertising, does "not enable advertisers to target customers based on specific queries and are
23 generally aimed at consumers who are further from the point of purchase." The enforcers' complaint
24 also quotes the statement of Google's Chief Economist that "[o]ne way to think about the difference
25 between search and display/brand advertising is to say that 'search ads help satisfy demand' while
26 'brand advertising helps to create demand,'" and "[d]isplay and search advertising are complementary

27

28

<div align="center">41</div>

<div align="center">FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT<br>CASE NO. 5:20-cv-03556-BLF</div>

1    tools, not competing ones." Thus, given that search and display advertising, by Google's own
2    admission, do not compete for the same business, they occupy distinct antitrust markets.

3        200.    Additionally, the market for display advertising services is separate and distinct from
4    the market for advertisement inventory—*i.e.*, the spaces on websites that publishers make available for
5    advertisers to purchase. At least thousands of companies act as publishers with display advertisement
6    inventory, but in general, these companies do not offer the services that facilitate placement of
7    advertisements into the supply of display advertising space. Only a few companies—Google chief
8    among them—now provide display advertising services.

9        201.    There are high barriers to entry for the display advertising market and its component
10   submarkets. Entering any of these markets requires a substantial investment to develop and implement
11   the technology necessary to compete. Consequently, "advertisers and publishers alike have few
12   options when deciding how to buy and sell online ad space," concludes the 2020 House Subcommittee
13   report on competition in digital markets.

14       202.    Google's overall conduct, including leveraging its internet search platform dominance
15   and denying interoperability in several respects, as described above, has made it exponentially more
16   difficult for would-be market participants to effectively enter these markets and compete with Google.
17   Google has used its market dominance to ensure that market entry by would-be competitors is
18   infeasible. And Google's conduct, moreover, has made it impractical for existing market participants
19   to compete—which has resulted in large numbers of companies exiting the relevant market.

20       203.    Programmatic display advertising—the subject of this action—serves a different
21   purpose and is not reasonably interchangeable with social-media display advertising. Google's
22   automated display advertising services *connect* independent entities—advertisers and publishers. In
23   other words, advertisers use display advertising services to access a *range* of publication options and
24   thereby reach a broader group of users. Publishers, in turn, use display advertising services to access
25   many potential advertisers. Google operates in an open-ended market in which it facilitates the
26   transactions between these advertisers and publishers.

27       204.    By contrast, companies like Facebook, Twitter, and Snapchat primarily host social

28
                                                    42

                          FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                          CASE NO. 5:20-cv-03556-BLF

1 media content, while Amazon primarily operates an online market for goods. These web businesses
2 are suppliers of their own ad inventory and have close-ended, in-house display advertising systems
3 that they use to publish advertisements on their own sites. Those services are not available to other
4 publishers, and advertisements that appear on these close-ended websites only reach visitors to *those*
5 websites. To advertise across the open web—rather than, for example, on Facebook or Amazon
6 specifically—an advertiser must engage with the ad tech stack that Google dominates.

7     205.   As the House Subcommittee report explains:

8         Within display advertising there are two separate "ad tech" markets . . .
9         first-party and third-party. "First-party" platforms refer to companies such
        as Facebook, Twitter, and Snap which sell ad space on their own platforms
10         directly to advertisers. . . . Third-party display ad tech platforms are run by
        intermediary vendors and facilitate the transaction between third-party
11         advertisers, such as the local dry cleaner or a Fortune 500 company, and
12         third-party publishers, such as *The Washington Post* or a blog.

13     206.   The close-ended advertising services offered by Facebook, Amazon, Twitter, and
14 Snapchat (among other web businesses) are not, therefore, reasonable substitutes for the open-ended
15 system Google offers and do not compete for the same business. "Programmatic" CPM ads are thus
16 distinguished from "social media" CPM ads among participants in the digital advertising industry.

17 **VII.   ANTITRUST IMPACT**

18     207.   Google's conduct set forth herein had the purpose and effect of excluding competition
19 in the relevant market. Absent Google's conduct, each segment of the display advertising market
20 would have been significantly more competitive and class members would have financially benefited
21 from that increased competition.

22     208.   Google's monopoly conduct has caused ongoing and durable harm to competition in
23 the display advertising market. Google's monopoly power has enabled it to raise its prices above the
24 competitive level to advertisers and, in turn, pay lower than competitive prices to publishers. Google
25 has extracted monopoly rents in the form of fees it does not fairly disclose to other market participants.

26     209.   A competitive market would have benefited both the advertisers and the publishers that
27 use display advertising services. Firms that provide display advertising services make money in a

28

43

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

variety of ways, including by retaining the difference between (1) what an advertiser pays the provider to place ads, and (2) the portion of that payment that the provider remits to a publisher for placing the ads on its website. In a competitive market, advertisers would have paid less to have their ads placed, and publishers would have received more for placing the ads on their websites.

210. With Google stifling competition and extracting monopoly rents as the dominant intermediary, both advertisers and publishers lost money. The antitrust economist Fiona Scott Morton noted that,

> [i]f advertisers had more choices in the but-for world about where and through whom to place their ads, they would not continue to give their business to Google in the face of an overcharge. Google would have to choose between losing advertisers' business to rivals whose auctions were fair, or adopting an auction design that generated competitive (lower) prices for advertisers.

211. In sum, the marked decrease in competition that has resulted from Google's conduct has caused economic injury to Plaintiffs and class members because advertisers have paid more than they otherwise would have paid, and publishers have been paid less than they otherwise would have been paid.

## VIII. TOLLING OF THE STATUTE OF LIMITATIONS

### A. The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

212. Plaintiffs and class members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

213. As described herein, Plaintiffs and class members suffered antitrust injury in the form of economic losses as a result of Google's wrongful exercise of monopoly power in the relevant market. Other than dealing directly with Google when using its digital advertising services, Plaintiffs had no direct contact or interaction with Google and no means from which they could have discovered these injuries and the other bases for their causes of action set forth in this complaint.

214. Throughout the class period, and continuing thereafter, there was no information in the

1  public domain sufficient to put Plaintiffs on notice that Google had wrongfully acquired a display
2  advertising monopoly or was using its monopoly power to charge advertisers supra-competitive prices
3  for display advertising and to pay sub-competitive prices to publishers of such advertising.

4      215.   It was reasonable for Plaintiffs and class members not to suspect that Google was
5  engaging in any unlawful and injurious anticompetitive behavior.

6      216.   While certain of Google's anticompetitive acts occurred before the applicable limitations
7  periods, not until recently, with the announcement of governmental investigations into Google's
8  monopolization of the market for intermediation services in the online display advertising market,
9  could Plaintiffs have discovered their antitrust injuries and causes of action set forth in this complaint.
10  At the time it occurred, no reasonable class member had any basis to discern the anticompetitive nature
11  of Google's conduct described in this complaint that occurred before the applicable limitations periods.

12     217.   Plaintiffs allege a continuing course of unlawful conduct by Google, including conduct
13  within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm
14  to Plaintiffs and class members within the applicable statutes of limitations.

15     218.   For these reasons, the statutes of limitations applicable to Plaintiffs' and class members'
16  claims have been tolled with respect to the claims asserted herein.

17     **B.   Google's Fraudulent Concealment Tolled the Statute of Limitations**

18     219.   Additionally or alternatively, application of the doctrine of fraudulent concealment
19  tolled the statutes of limitations on Plaintiffs' claims. Plaintiffs had no knowledge of Google's
20  wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient
21  to place them on inquiry notice of their injuries or the other bases for their causes of action, during the
22  class period and continuing thereafter. No information in the public domain or otherwise available to
23  Plaintiffs during the class period suggested that Google had wrongfully acquired a digital advertising
24  monopoly or was using its monopoly power to charge advertisers supra-competitive prices for display
25  advertising and to pay sub-competitive prices to publishers of such advertising.

26     220.   Google concealed its illicit and harmful conduct, both by failing to disclose its wrongful
27  acquisition and maintenance of a digital advertising monopoly through exclusionary acts in the relevant

28

45

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1   market, and by affirmatively denying that it was engaged in such conduct. Google has (repeatedly)

2   publicly denied allegations by American and foreign regulators that it has abused its power in digital

3   advertising markets. These affirmative statements, and Google's nondisclosure that it had acted to

4   forestall competition, served to fraudulently conceal Google's unlawful monopoly in brokering online

5   display advertising.

6        221.    When the French Competition Authority fined Google $167 million in late 2019, Google

7   publicly defended its advertising policies in a statement issued on December 20, 2019, as purportedly

8   needed to "protect[ people] from exploitative and abusive ads." In fact, as discussed above, Google

9   adopted those policies to protect its monopoly power by heading off competition. Similarly, in

10   response to news reports in 2019 that federal and state officials had opened antitrust investigations into

11   Google's advertising business, a Google vice-president for product management, Sissie Hsiao, released

12   a public statement on September 11, 2019 asserting that "[c]ompetition is flourishing, and publishers

13   and marketers have enormous choice" when that was false.

14        222.    In addition to its affirmative fraud and nondisclosure, Google's anticompetitive conduct

15   also was inherently self-concealing because revealing the true facts concerning Google's monopolistic

16   behavior would have prompted governmental enforcement activity and/or class action litigation.

17   Digital advertising is subject to antitrust regulation, so it was reasonable for Plaintiffs and class

18   members not to suspect that digital advertising services were being sold in a noncompetitive market. A

19   reasonable person under the circumstances would not have had occasion to suspect Google was

20   brokering display advertising at supra-competitive prices (for advertisers) and sub-competitive prices

21   (for publishers) at any time during the class period.

22        223.    Because Google's antitrust violations were self-concealing and affirmatively concealed

23   by Google, Plaintiffs and class members had no knowledge of Google's antitrust violations or of any

24   facts or information that would have caused a reasonably diligent person to suspect Google of having

25   wrongfully acquired and maintained monopoly power during the class period.

26        224.    Therefore, by operation of Google's fraudulent concealment, the statutes of limitations

27   applicable to Plaintiffs' and class members' claims were tolled throughout the class period.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

IX.   **CLASS ACTION ALLEGATIONS**

225.   Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of the following class:

> All persons and entities in the United States that, from January 1, 2016 to the present, used Google's display advertising services to (1) place an ad on a website operated by another entity (advertisers) or (2) place an ad from a third party on their own website (publishers).

Excluded from the proposed class are: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

226.   The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).

227.   The members of the class are so numerous that joinder is impracticable. The class includes at least hundreds of thousands of members that are widely dispersed throughout the country.

228.   Plaintiffs' claims are typical of the claims of all class members. Plaintiffs' claims arise out of a common course of conduct that gives rise to the claims of all other class members. Plaintiffs and all class members were and will continue to be damaged in the same manner by the same wrongful conduct, namely Google's unfair business practices and monopolization of the market for display advertising services.

229.   Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.

230.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with antitrust litigation.

231.   Numerous questions of law or fact common to the class arise from Google's course of conduct to exclude competition in the relevant market, including:

    a.   Whether Google holds monopoly power in the relevant market;

    b.   Whether Google unlawfully acquired and maintained monopoly power in the

47

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1    relevant market;

2              c.       Whether Google engaged in unfair business practices that reduced competition in

3    the relevant market;

4              d.       The form and content of injunctive relief to restore competition; and

5              e.       The amount of damages owed the class as a result of Google's illegal activity.

6         232.    Questions of law and fact common to members of the class will predominate over any

7    questions that may affect only individual class members because Google acted on grounds generally

8    applicable to the class as a whole. For the same reason, class certification for purposes of adjudicating

9    Plaintiffs' claims for injunctive and declaratory relief is appropriate.

10        233.    This class action is superior to other alternatives for the fair and efficient adjudication of

11   this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility

12   of repetitive litigation. There will be no material difficulty in the management of this action as a class

13   action.

14        234.    The prosecution of separate actions by individual class members would create the risk of

15   inconsistent or varying adjudications, establishing incompatible standards of conduct for Google.

16        235.    Plaintiffs reserve the right to seek class certification with respect to common issues,

17   including issues related to Google's duties or conduct.

18   **X.       CAUSES OF ACTION**

19                                   **FIRST CAUSE OF ACTION**
                           **VIOLATIONS OF THE SHERMAN ANTITRUST ACT**
20                                          **15 U.S.C. § 2**

21        236.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

22        237.    The market for programmatic display advertising services in the United States is a

23   relevant antitrust market, and Google has monopoly power in that market.

24        238.    Google wrongfully acquired and unlawfully maintained monopoly power in the relevant

25   market through the overall scheme and conduct alleged herein, including by leveraging its monopoly

26   power in the online search and other markets to coerce the purchase and use of its display advertising

27   services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several

28                                                  48

                       FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                      CASE NO. 5:20-cv-03556-BLF

1   technological fronts, restricting competing firms' access to information, and rigging auctions that it

2   controlled to its own advantage.

3      239.   Google's actions were carried out willfully and with the specific intent to acquire and

4   maintain monopoly power in the relevant market through anticompetitive conduct and not through a

5   superior product, business acumen, or a historic accident.

6      240.   Google's exclusionary conduct has foreclosed a substantial share of the market for

7   programmatic display advertising services.

8      241.   As a direct and proximate cause of Google's conduct, Plaintiffs and members of the

9   class have suffered antitrust injury in the form of economic losses. Those losses constitute antitrust

10   injury, as they are an injury of the type the antitrust laws were intended to prevent and that flows from

11   what makes Google's monopolistic acts unlawful. But for Google's unlawful exclusionary conduct,

12   competition would have prevailed in the relevant market and Plaintiffs and class members would not

13   have sustained these losses. Google's conduct also deprived Plaintiffs and class members of improved

14   quality and innovation in the relevant market.

15      242.   There is no legitimate pro-competitive justification for Google's anticompetitive

16   conduct, and even if there were, less restrictive alternatives to achieve it would exist.

17      243.   Plaintiffs and members of the class are entitled to equitable relief as appropriate to halt

18   Google's monopoly conduct and restore competition in the relevant market. Members of the class are

19   regular users of display advertising services and will continue to purchase such services and suffer

20   further injury if Google's monopoly is not ended. The primary purpose of such injunctive relief will be

21   to benefit the public from the lower prices and greater innovation that will prevail in competitive digital

22   advertising markets in the absence of Google's monopoly.

23      244.   Plaintiffs and members of the class are entitled to damages, including treble damages,

24   sustained as a result of Google's monopolistic acts and practices.

25

26

27

28

49

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

## SECOND CAUSE OF ACTION
### VIOLATIONS OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)

245.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

246.   Google's conduct is unlawful in violation of the UCL because it violates the Sherman Antitrust Act, 15 U.S.C. § 2.

247.   Google has engaged in unfair business practices through the overall scheme and conduct alleged herein, which has restrained competition. Google's conduct is unfair, in violation of the UCL, because it violates California's clearly established public policy forbidding monopolistic acts. Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

248.   Google's practices also are unfair in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including from Google's supra-competitive prices that advertisers paid and Google's anticompetitive underpayments to publishers, that outweighs by a wide margin any possible utility from the practices.

249.   Google's unlawful and unfair business practices actually and proximately caused Plaintiffs and class members to lose money or property.

250.   Plaintiffs and class members lack an adequate remedy at law to redress certain conduct of Google that violates the unfair prong of the UCL. Through the practices described herein, Google suppressed competition in its incipiency, violated well-established antitrust policies, and significantly harmed and threatened competition in the relevant market.

251.   Accordingly, on behalf of the class, Plaintiffs seek injunctive relief, restitution, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper. The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater

50

1  innovation that will prevail in competitive digital advertising markets in the absence of Google's
2  monopoly.

3  **XI.    PRAYER FOR RELIEF**

4  WHEREFORE, Plaintiffs, on behalf of themselves and the class defined herein, respectfully
5  request that this Court:

6  A.    Determine that this action may be maintained as a class action pursuant to Fed.
7  R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the class,
8  appoint Plaintiffs as named representatives of the class, and appoint the undersigned Plaintiffs' counsel
9  as class counsel;

10  B.    Enter judgment against Google and in favor of Plaintiffs and the class;

11  C.    Enter injunctive relief to restore competition in the relevant market and its
12  constituent submarkets;

13  D.    Award damages, including treble damages, and/or restitution to the class in an
14  amount to be determined at trial, plus interest in accordance with law;

15  E.    Award Plaintiffs and the class their costs of suit, including reasonable attorneys'
16  fees, as provided by law; and

17  F.    Award such further and additional relief as is necessary to redress the harm
18  caused by Google's unlawful conduct and as the Court may deem just and proper under the
19  circumstances.

20  **XII.    DEMAND FOR JURY TRIAL**

21  Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all matters
22  so triable.

23

24  Dated: December 4, 2020                                    Respectfully submitted,

25
                                                             By:  /s/ *Dena C. Sharp*
26
                                                             Dena C. Sharp (State Bar No. 245869)
27                                                           Jordan Elias (State Bar No. 228731)
                                                             Adam E. Polk (State Bar No. 273000)
28
                                                             51
---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

Tina Wolfson (State Bar No. 174806)
Theodore W. Maya (State Bar No. 223242)
Rachel Johnson (State Bar No. 331351)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
rjohnson@ahdootwolfson.com

Scott L. Silver (*pro hac vice* forthcoming)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
Tel: (954) 755-4799
ssilver@silverlaw.com

*Attorneys for Plaintiffs*

52

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF